[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 31, 2006
THOMAS K. KAHN
CLERK

_____

No. 05-14695

_____

D. C. Docket No. 04-00307-CV-BH-B

CLAUDELL L. MACK,
THEODORE CARTHEN,
JON KEITH GEORGE,
EARL J. MALLORY,
CLARENCE MCDONALD, III,
DAMON L. WAYNE,

                                                        Plaintiffs-Appellants,

versus

ST MOBILE AEROSPACE ENGINEERING, INC.,

                                                        Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Alabama

_____

**(July 31, 2006)**

Before HULL and WILSON, Circuit Judges, and GOLDBERG,* Judge.

WILSON, Circuit Judge:

Claudell Mack, Theodore Carthen, Jon George, Earl Mallory, Clarence McDonald, and Damon Wayne appeal from the district court's entry of summary judgment in favor of their employer ST Mobile Aerospace Engineering, Inc. ("MAE") on their claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., and the Civil Rights Act of 1991, 42 U.S.C. § 1981. They allege that there were issues of material fact as to whether MAE subjected them to a racially hostile work environment and disparate treatment in terms of pay, promotion, demotion, discipline, and other terms and conditions of employment. They also argue that the court abused its discretion in striking certain portions of their opposition to summary judgment as inadmissible. We agree, except as to the claims of disparate treatment.

I.    BACKGROUND

MAE operates a commercial aircraft maintenance and repair facility in Mobile, Alabama. Its facilities include aircraft runways and ramps, eight aircraft hangars, workshops, storerooms, and administrative offices. MAE has

_____

*Honorable Richard W. Goldberg, Judge, United States Court of International Trade, sitting by designation.

approximately 1,000 employees and 400 contract workers. Most of these employees and contract workers are aircraft mechanics and are classified in progressively higher skill levels: Apprentice, Mechanic I, Mechanic II, and Senior Mechanic. MAE has Lead Mechanics who direct the daily work of their crews, relay instructions from management, evaluate mechanics' job performance, and at times, recommend employment decisions. MAE also has Acting Leads, who are appointed temporarily for a particular project, and Relief Leads, who substitute in the Lead Mechanic's absence.

MAE's Policy and Procedure Manual ("PPM") regulates its operations, including compensation, standards of conduct, discipline, performance evaluations, and skill-level progressions. Under the PPM, a new mechanic receives a skill-level designation based on his or her performance during his first 90 days of work. Mechanics are paid within the pay range for their position based on experience, skill level, and job performance. They receive periodic performance reviews, based on a scoring system from 1 to 7. Mechanics can earn non-competitive, skill-level promotions, i.e., a progression from Mechanic I to Mechanic II, as well as competitive promotions to "Lead" or "Project Manager" based on their application for the position and performance.

MAE maintains a Equal Employment Opportunity/Harassment Policy that

prohibits discrimination and harassment, particularly any managers' or supervisors' harassment of employees under his or her supervision. During most times relevant to the plaintiffs' claims, the Policy's complaint procedure required that employees report any incident of harassment or discrimination directly to the Manager of Administration George Bell or the Manager of Human Resources Dick Wellington, both white males. MAE encourages employees also to report any violation to his or her manager or supervisor, who has a responsibility to prevent harassment, to stop it if it occurs, and to report any violations directly to Manager Bell. However, "[i]t is essential" under the Policy that an employee notify Bell or Wellington of any violation: "Reporting [] to your manager or supervisor is not sufficient."

Over the years, MAE disseminated and explained the Policy to all employees and trained directors, managers, supervisors, and leads on their obligations under the Policy. MAE established an EEO Council, which did not replace the complaint procedure under the Policy but provided an additional point of contact for employees with concerns about discrimination or harassment. The evidence revealed that, throughout his 14 years as Manager of Administration, Bell received 10 "official" complaints of race discrimination under the Policy, two of which he failed to investigate, according to the plaintiffs.

4

The six plaintiffs' claims in this lawsuit arise from their work as aircraft mechanics at MAE. Other than Plaintiff Wayne, each of the plaintiffs continues to work at MAE. On May 11, 2004, the plaintiffs, all black males, collectively filed a complaint against the company, claiming they were subjected to a racially hostile work environment "characterized by the pervasive use of racial slurs and offensive symbols" over a period of several years. Each plaintiff also claimed he was subjected to disparate treatment in the terms and conditions of his employment. The district court granted summary judgment on each of the claims.

## II.    DISCUSSION

### A.    Hostile Work Environment Claim

First, we consider whether genuine issues of material fact remain as to whether the plaintiffs were subjected to a racially hostile work environment. We review the district court's entry of summary judgment de novo, "applying the same legal standards as the district court did and viewing all of the facts in the light most favorable to the non-moving party." *Cooper v. Southern Co.*, 390 F.3d 695, 723 (11th Cir. 2004). "Summary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Id.* (quoting

5

Fed. R. Civ. P. 56(c)).

A hostile work environment claim is established upon proof that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367, 370, 126 L. Ed. 2d 295 (1993) (quotations and citations omitted). The plaintiff must show:

> (1) that he belongs to a protected group; (2) that he has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the [plaintiff]; (4) that the harassment was sufficiently severe or pervasive to alter the terms or conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or direct liability.

*Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002) (citing *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999) (en banc)). Here, the fourth and fifth elements are at issue.

### 1.    Whether the Harassment was Sufficiently Severe or Pervasive

The fourth element has both subjective and objective components. *Mendoza*, 195 F.3d at 1246. "The employee must 'subjectively perceive' the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable. The

6

environment must be one that 'a reasonable person would find hostile or abusive' and that the victim subjectively perceives . . . to be abusive.'" *Id.* (quoting *Harris*, 510 U.S. at 21, 114 S. Ct. at 370).

"[T]he objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81, 118 S. Ct. 998, 1003, 140 L. Ed. 2d 201 (1998) (quoting *Harris*, 510 U.S. at 23, 114 S. Ct. at 371). The objective component is "fact intensive," and courts consider four factors when determining whether harassment objectively altered the employee's terms and conditions of employment: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Mendoza*, 195 F.3d at 1246. Courts consider the alleged conduct "in context, not as isolated acts, and determine under the totality of the circumstances whether the harassing conduct is sufficiently severe or pervasive . . . ." *Id.* We recognize that MAE disputes the plaintiffs' version of many events, but at this summary judgment stage, we now outline the facts in the light most favorable to the plaintiffs' version of what has happened and continues to happen in MAE's workplace.

7

### a. Nooses

There are extensive facts to support the plaintiffs' argument that they were subjected to severe and pervasive harassing conduct. First, the plaintiffs collectively alleged that they personally witnessed no less than seven nooses on MAE premises over a two-year period from 2002 to 2003. The evidence showed that, in February 2002, MAE discovered a rope noose suspended from a work stand in Hangar 8. Manager Bell concluded that the noose was not a typical "hangman's noose," but rather was a rope used to suspend air hoses to facilitate work. Bell warned management in the area that even work-related objects could appear to be offensive.

One month later, on March 1, 2002, MAE discovered an actual "hangman's noose." MAE identified two white employees who were responsible for the noose and discharged them. The company also sent all employees a letter to confirm that the perpetrators had been disciplined and to announce that it had created its EEO Council as another point of contact for employees with concerns. Around that same time, in February or March 2002, Plaintiff Carthen found an additional noose made of yellow rope on the tail stand of a DC-10 in another hangar. He removed the noose, but did not report it to anyone.

Plaintiff Wayne witnessed yet another noose hanging from a work station in

8

Hangar 8 in November 2002. As he approached the noose, Wayne heard Lead Quinn Holbrook, a white male, say "that's for them . . . the niggers." Wayne reported the comment to Supervisor David Nemecek, a white male, who failed to report the comment to Managers Bell or Wellington, as the Policy required. When Wellington finally learned of the incident in the process of this litigation in 2003, he counseled Holbrook about the seriousness of the allegation and reminded him of his obligations under MAE's Policy.

The next year, in May 2003, Plaintiff McDonald discovered two small nooses made from safety wire, although he did not report the nooses to management. Finally, Plaintiff Wayne witnessed a small black figurine with a noose around its neck on a toolbox in Hangar 3 or Hangar 5 in September 2003. He immediately reported the noose to Manager Bell. At that time, Wayne also reported to Bell that, in the same hangar with the noose, there were many toolboxes with rebel flags on them in violation of company policy. Bell dismissed him, commented on his impending retirement, and took no action.

### b. *Racial Graffiti*

The plaintiffs also alleged that there was a constant presence of racial graffiti on MAE premises. For example, Plaintiff Wayne repeatedly witnessed racial graffiti on restroom walls, toolboxes, tables, and lockers, including swastikas,

"KKK," "black power," and "it's black history month, we ain't going to go to the [Mardi Gras] . . . ball" on a restroom wall with the word "black" scratched out and the word "mooley" substituted. Wayne witnessed the words "wish damn janitors would clean this place up, damn monkeys" written in the restroom outside Manager Wellington's office in approximately September 2004. Wayne reported offensive graffiti to Manager Bell in March 2003, who directed MAE personnel to remove it.

Plaintiff McDonald also witnessed offensive graffiti, including racial slurs and jokes and "KKK" written in the men's restrooms and on a parts rack. He saw the word "nigger" written on restroom walls, picnic tables, and parts tables. When he witnessed this graffiti, he reported it to his leads but not to Managers Bell or Wellington. Plaintiff George witnessed similar racial graffiti on restroom walls in various hangars, as recently as August 2004. Once, when he reported the graffiti to his lead, the graffiti was removed.

Plaintiffs Carthen, Mack, and Mallory also witnessed racial graffiti, although they did not report it. Carthen saw racist symbols on bathroom walls, headbands, and t-shirts. He observed a large "KKK" symbol spray-painted in the restroom several times, and it remained there for approximately one month before it was removed. Mack saw the letters "KKK," swastikas, and other racial graffiti on

restroom walls and on a parts rack. Mallory witnessed the words "nigger go home" written on a restroom wall, the letters "KKK," and other racial graffiti, such as "stick people" with nooses around their necks.

MAE admitted receiving reports of graffiti dating back to 1996. Throughout the years, MAE attempted to prevent graffiti by remodeling the restrooms to make it more difficult for anyone to write on the walls, by routinely inspecting the restrooms, and by sending memoranda to employees and posting signs warning perpetrators of discipline.

### c. Racially Derogatory Comments

The plaintiffs also allege that both supervisors and co-workers directed racially derogatory comments toward them or used such offensive words in their presence. For instance, in June 2003, when Plaintiff Mack learned that co-worker Joshua Frye, a white male, had been promoted from Apprentice to Mechanic after only six months, he asked Lead Holbrook why Frye and two other white Apprentices had been promoted so quickly, while it took Mack 18 months to be promoted to the same position. Holbrook responded, "I'll tell you the fucking problem, Mack, you're the wrong fucking color." Mack reported this comment to Manager Bell who reviewed the EEO Policy with Holbrook and warned that the statement was unacceptable in the workplace. The next day, co-workers

11

commented that Mack was "getting all the good jobs now" and that "He's the token guy on our crew." Mack did not report these additional comments.

According to Plaintiff Wayne, white Lead Robert Craft called him "boy" a number of times and Lead Holbrook referred to him as "boy" between 10 and 20 times. In August 2001, Wayne complained to Supervisor Gerald McAdams, a white male, but no action was taken. During a meeting in which Project Manager Sam Mendenhall, a white male, was present, Craft said to Wayne, "Boy, I'll talk to you any kind of way I want to talk to you." Again, no action was taken. In 2002, Wayne complained to Manager Charles Gennaro, a white male, that Supervisor McAdams asked Wayne, "How's my favorite token?" On another occasion, Wayne reported that he heard Acting Supervisor John Shaw, a white male, call a contract worker a "lazy nigger." MAE permanently demoted Shaw and suspended him for five days without pay. Later, when Wayne arrived for an interview with MAE's investigator, who was investigating the plaintiffs' EEOC charges, he overheard Manager Bell say, "I'll be glad when we can get rid of all of them," allegedly referring to the plaintiffs. Wayne reported this comment to the investigator several times.

Plaintiff Carthen alleged that racial slurs, such as "your black ass," were so prevalent at MAE that "if you're walking the hangar floor[,] you cannot miss

12

[them]." Carthen testified that a white co-worker said to him, "hey, what's up my nigger?" Carthen asked the co-worker not to use that word, but he did not report the incident. Plaintiff George heard a white co-employee tell a joke that included the word "nigger." Lead Mechanic Bill Barnes, a white male, overheard the joke and reprimanded the employee, but no one reported the incident to Managers Bell or Wellington.

In November 2003, Plaintiffs George and McDonald met with Manager Wellington to express their concern about an incident in which co-worker Lynette Beasley referred to co-worker Millie Williams as a "nigger." Wellington told George that the incident was "just a case of slip of the tongue." Beasley was suspended for two weeks without pay. In May 2003, Plaintiff Mallory reported to Manager Bell that a white co-worker made a series of racial remarks to him, including: "Have you ever been to a party where everybody has on white sheets and hoods but you;" "I want to take you to a party this weekend where everybody is going to have a white sheet and hood on but you;" and "we'll bring some black pussy there. . . . yea, that's what I want to get me some black pussy." MAE counseled the co-worker on the EEO Policy and suspended him for one week without pay.

d.      *Confederate Flags*

13

Finally, the plaintiffs allege that displays of the Confederate or rebel flag, particularly on t-shirts, hats, toolboxes, bumper stickers, and tattoos, permeated the MAE workplace. They alleged that these symbols were present as recently as the time of their depositions, even after MAE had issued a memorandum regarding offensive racial symbols. Among other allegations, the plaintiffs alleged that they witnessed Confederate flag bumper stickers on vehicles parked in MAE's lot, including one on Manager Bob Holloway's vehicle in January 2005, a rebel flag tattoo on the left arm of Supervisor Lloyd Hodges, and a Confederate flag decal displayed on a Relief Lead's toolbox. Plaintiff Carthen witnessed toolboxes with rebel flags "every day."

MAE admitted that it received complaints about the Confederate flag over the last two years. Wellington admitted witnessing rebel flags on toolboxes as recently as two weeks before his deposition. The company prohibited Confederate flag decals and license plates on all vehicles parking within the security fence on company premises, required that any Confederate flags be removed from any new toolboxes, and published a memorandum to employees regarding offensive racial symbols.

On April 1, 2003, Plaintiff McDonald placed a complaint titled "Racism" in the suggestion box near Manager Bell's office. He complained that minority

employees found it difficult to work productively in MAE's environment. McDonald later visited Bell to discuss the compliant, but Bell said he was too busy and promised to meet later. Bell never did so. Later that year, in October 2003, McDonald made a second written complaint about racism. This time, Bell investigated and found no EEO violation but failed to inform McDonald of the outcome of his investigation.

The district court ruled that "the plaintiffs . . . failed to produce sufficient evidence to show that the racial 'slurs' and 'symbols' were sufficiently 'severe or pervasive' to alter the terms and conditions of any plaintiffs' employment and create an 'abusive working environment.'" It ruled that the alleged racial slurs and symbols were merely offensive utterances and were not physically threatening. The court found that the plaintiffs relied "in whole or in part on second-hand reports of racially-motivated incidents towards other employees." It ruled that the impact of such "second-hand harassment is obviously not as great as the impact of harassment directed at the plaintiff[s]."

        *e.*     *Severe and Pervasive Harassment under the Totality of the Circumstances*

We find that, based on a totality of the circumstances, the plaintiffs produced sufficient evidence to create an issue of fact as to whether the plaintiffs were subjected to a racially hostile work environment. *See Allen v. Tyson Foods, Inc.*,

15

121 F.3d 642, 645 (11th Cir. 1997).  First, there is no doubt that the plaintiffs subjectively perceived the environment at MAE as hostile, and MAE did not argue this point to the contrary.  Turning to the four objective factors, the harassing conduct at MAE was frequent.  The plaintiffs testified that racial graffiti and Confederate flags permeated the MAE premises for many years.  Although MAE attempted to prevent the graffiti and displays of the Confederate flag, the plaintiffs frequently continued to discover the offensive symbols on restroom walls, toolboxes, baseball caps, and bumper stickers.  The conduct was also severe, physically threatening, and humiliating, as evidenced by the fact that the plaintiffs discovered no less than seven nooses at MAE during a two year period from 2002 to 2003.  There was further evidence showing that both employees and management directed racially derogatory words and jokes, such as "boy," "nigger," and the statement that "you're the wrong fucking color," toward the plaintiffs and others.  Finally, there was evidence that the harassing conduct prevented the plaintiffs from effectively performing their jobs.  On at least one occasion, Plaintiff McDonald filed a written complaint that minority employees found it difficult to work productively in MAE's racial environment.

This case differs from cases in which we have determined that the harassment was not severe and pervasive because there were fewer instances of

less objectionable conduct over longer periods of time. *See e.g.*, *Mendoza*, 195 F.3d at 1247 (ruling that a supervisor's conduct in making one alleged sexual comment toward the plaintiff, once rubbing up against the plaintiff, making a sniffing sound three times in the plaintiff's presence, and constantly following and staring at the plaintiff was insufficient to affect the plaintiff's terms and conditions of employment); *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 585-86 (11th Cir. 2000) (ruling that a co-worker's conduct in complimenting the plaintiff's appearance, frequently calling the plaintiff's home, and touching the plaintiff's knee and hem, among other conduct, was not physically threatening, humiliating, or severe). The facts in this case involve much more frequent and severe hostile conduct than *Mendoza* and *Gupta*, and the evidence, in the light most favorable to the plaintiffs, creates an issue of fact for the jury. *See Dees v. Johnson Controls World Servs., Inc.*, 168 F.3d 417, 418 (11th Cir. 1999); *Allen*, 121 F.3d at 647. There is "not simply some magic number of racial or ethnic insults" that preclude summary judgment, but rather "it is repeated incidents of . . . harassment that continue despite the employee's objections [that] are indicative of a hostile work environment." *Miller*, 277 F.3d at 1276 (citation and quotation omitted).

The district court evidently viewed the plaintiffs' allegations in isolation, discounting each, to conclude that the conduct was not sufficiently severe or

17

pervasive.  Our well-established precedent requires a court to evaluate the evidence "in context, [and] not as isolated acts, and . . . under the totality of the circumstances."  *Mendoza*, 195 F.3d at 1246.  We disagree with the district court's characterization of the plaintiffs' case as one based largely on comments directed at third parties, or incidents that the plaintiffs only learned about from third parties.  "The prima facie showing in a hostile work environment case is likely to consist of evidence of many *or very few* acts or statements . . . which, taken together, constitute harassment. . . . [T]he jury does not necessarily examine each alleged incident of harassment in a vacuum."  *Vance v. Southern Bell Tel. & Tel. Co.*, 863 F.2d 1503, 1510-11 (11th Cir. 1989), *overruled on other grounds*, *Harris*, 510 U.S. at 22, 114 S. Ct. at 371 (emphasis added) (ruling that the evidence, viewed as a whole, established racial harassment, when a noose was twice hung at the plaintiff's work station). Viewing the evidence in its entirety, in the light most favorable to the plaintiffs, we rule that there is a genuine issue of material fact as to whether MAE was "permeated with discriminatory intimidation, ridicule, and insult, that [was] sufficiently severe or pervasive to alter the conditions of . . . employment and create an abusive working environment."  *Harris*, 510 U.S. at 21, 114 S. Ct. at 370 (quotations and citations omitted).

### 2.    Whether MAE Was Liable for the Conduct

Whether MAE is liable for this harassing conduct depends on whether it was committed by supervisors or by co-workers. An employer is strictly liable for harassment committed by supervisors that "culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765, 118 S. Ct. 2257, 2270, 141 L. Ed. 2d 633 (1998). However, where no tangible employment action is taken, the employer may raise as an affirmative defense to liability "(a) that the employer exercised reasonable care to prevent and correct promptly any . . . harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer . . . ." *Faragher v. City of Boca Raton,* 524 U.S. 775, 807, 118 S. Ct. 2275, 2293, 141 L. Ed. 2d 662 (1998). With regard to the first element of the *Faragher* affirmative defense, an employer's anti-harassment policy fulfills its obligation unless the policy was administered "in bad faith" or the policy was otherwise "defective or dysfunctional." *Madray v. Publix Supermarkets., Inc.*, 208 F.3d 1290, 1299 (11th Cir. 2000) (quotations and citations omitted). Furthermore, "while proof that an employee failed to fulfill [his] obligation of reasonable care to avoid harm is not limited to showing an unreasonable failure to use any complaint procedure provided by the employer, demonstration of such failure will normally suffice to satisfy the employer's

19

burden under the second element of the defense." *Faragher*, 524 U.S. at 807-08, 118 S. Ct. at 2293.

An employer is directly liable for co-worker harassment if it "knew [actual notice] or should have known [constructive notice] of the harassing conduct but failed to take prompt remedial action." *Miller*, 277 F.3d at 1278. "Actual notice is established by proof that management knew of the harassment, whereas constructive notice can be shown where the harassment was so severe and pervasive that management should have known of it." *Id.* We consider the following factors to be relevant in determining whether harassment was so pervasive as to provide constructive notice: "the remoteness of the location of the harassment as compared to the location of management; whether the harassment occurs intermittently over a long period of time; whether the victims were employed on a part-time or full-time basis; and whether there were only a few, discrete instances of harassment." *Allen*, 121 F.3d at 647.

Here, the court ruled that MAE satisfied its obligation under the *Faragher* defense to exercise reasonable care by implementing and disseminating an anti-harassment policy. With regard to co-worker harassment, the court ruled that MAE did not have actual notice of the alleged harassment because many of the incidents were never reported to the company. Moreover, MAE promptly

investigated the few incidents that the plaintiffs reported. The court further concluded that reports to lower-level supervisors, managers, or leads were insufficient to put MAE on constructive notice. However, the district court once again failed to examine all of the evidence in the record and erred by considering incidents and pieces of the evidence in isolation.

There is no "uniform test" for determining whether an employer's anti-harassment policy demonstrates that the employer exercised reasonable care. *Madray*, 208 F.3d at 1298. Rather, "[t]he employer's size, location, geographic scope, organizational structure, and industry segment are just some of the characteristics that impact the analysis of whether the complaint procedures of an employer's anti-harassment policy adequately fulfill Title VII's deterrent purpose." *Id.* Here, the plaintiffs raised a genuine issue of material fact as to MAE's liability. There was evidence that MAE's EEO Policy did not adequately fulfill Title VII's deterrent purpose because it did not provide employees "alternative avenues for lodging a complaint other than a harassing supervisor." *Id.* Under the complaint procedure, Managers Bell and Wellington were the only designated company representatives who could properly receive complaints, yet the evidence arguably revealed both managers' insensitivity to harassment. Manager Bell was the alleged offender on at least one occasion when he commented that "[he'll] be glad when

21

we get rid of [the plaintiffs]," an incident which the district court failed to address. Manager Wellington allegedly characterized an incident in which one employee called another a "nigger," as a mere "slip of the tongue."

Furthermore, viewed in the light most favorable to the plaintiffs, there was considerable evidence that the complaint procedure was "defective" and "dysfunctional." *Id.* at 1299 (quotations and citations omitted). On two occasions, Manager Bell failed to respond to the plaintiffs' official complaints: when Plaintiff McDonald filed a written complaint titled "Racism" with Bell, and when Plaintiff Wayne reported to Bell that he discovered a small black figurine with a noose around its neck in Hangar 3. On another occasion, Bell investigated McDonald's complaint, but failed to inform McDonald of the outcome of the investigation. The record also revealed that, on at least five occasions, supervisors, managers, and leads failed to fulfill their obligation under the Policy to report complaints they received to Manager Bell, thus raising factual issues as to the Policy's ineffectiveness. For example, Lead Barnes did not report the racial joke he overheard; Supervisor Nemecek never reported Lead Holbrook's statement that a noose was "for them . . . the niggers;" Supervisor McAdams did not report the incident in which Leads Craft and Holbrook called Plaintiff Wayne "boy;" Manager Mendenhall did not report another incident in which Holbrook called

22

Wayne "boy;" nor did Manager Gennaro report the incident in which McAdams asked Wayne "How's my favorite token?" Therefore, we conclude that the plaintiffs raised a genuine issue as to whether MAE failed to exercise reasonable care to prevent and promptly correct harassment because there were inherent defects in the company's complaint procedures.

Moreover, there is an issue of fact as to whether MAE had actual knowledge of co-worker harassment and failed to take prompt remedial action. MAE admitted actual knowledge of ongoing racial graffiti and displays of the Confederate flag. The record reflects that MAE took remedial action by inspecting for graffiti and prohibiting the Confederate flag; but the company's action was largely ineffective because even supervisors continued to display the flag after it was prohibited. In fact, Wellington testified that he took no action against Supervisor Hodges for openly displaying his rebel flag tattoo, despite the fact that his tattoo arguably violated the company's dress code, which prohibited "[v]isible tattoos that . . . advocate sexual, racial, ethnic or religious discrimination." A company's "policy must be found ineffective when company practice indicates a tolerance towards harassment or discrimination." *Miller*, 277 F.3d at 1280.

The plaintiffs also established an issue of fact as to whether the racial harassment was so severe and pervasive that MAE should have known of it. There

was sufficient evidence that incidents of racial harassment, in the form of nooses, graffiti, racial slurs and jokes, and displays of the Confederate flag, permeated the open workplace at MAE. Under the facts in this case, the plaintiffs' failure to report every incident of harassment does not insulate MAE from liability. *Cf. Farley v. Am. Cast Iron Pipe Co.*, 115 F.3d 1548, 1554-55 (11th Cir. 1997) (ruling that an employee's failure to utilize an employer's effective and comprehensive anti-harassment policy that was "aggressively and thoroughly disseminated" will prevent constructive knowledge of such harassment from adhering to the employer). Under the totality of the circumstances, we cannot conclude that MAE's anti-harassment Policy would prevent a reasonable jury as a matter of law from charging the company with constructive notice of the harassment. *See Miller*, 277 F.3d at 1280.

In conclusion, at the summary judgment stage, the court has the duty to examine all of the offensive conduct "collectively," *Gupta*, 212 F.3d at 586, and "cumulatively," *Mendoza*, 195 F.3d at 1242, and to construe all evidence and inferences in the light most favorable to the nonmoving party. *Allen*, 121 F.3d at 646. Here, evidence was presented that demonstrated a genuine issue of fact concerning whether the plaintiffs were subjected to a racially hostile work environment. Whether there was in fact a racially hostile work environment at

24

MAE is for the trier of fact to decide. *See id.* at 648. In addition, the record presents issues of fact as to: (1) whether "[MAE] exercised reasonable care to prevent and correct promptly any . . . harassing behavior"; (2) whether MAE's anti-harassment policy was sufficiently and effectively enforced; and (3) whether the plaintiffs "unreasonably failed to take advantage of any preventive or corrective opportunities provided by [MAE]." *Faragher*, 524 U.S. at 807, 118 S. Ct. at 2275; *Frederick v. Sprint/United Mgmt. Co.*, 246 F.3d 1305, 1316 (11th Cir. 2001); *see also Clegg v. Falcon Plastics, Inc.*, No. 05-1826 (3d Cir. Apr. 6, 2006); *White v. BFI Waste Servs., LLC*, 375 F.3d 288, 299-300 (4th Cir. 2004). Accordingly, summary judgment was improper on this claim.

**B.      Motion to Strike Claim**

Next, we review the district court's decision to strike 50 passages from the plaintiffs' response in opposition to summary judgment. Generally, the passages referenced portions of the plaintiffs' deposition testimony during which they attributed certain damaging facts and statements to other MAE employees. In its motion to strike, MAE argued–in many instances, in a conclusory fashion–that the passages misstated the deposition testimony and consisted of inadmissible hearsay, double hearsay, opinion, speculation, and conjecture. Without identifying any particular passage, the plaintiffs generally responded that each could be considered

25

at summary judgment because they could be reduced to admissible form at trial or could be admissible under a hearsay exception, such as an admission by a party-opponent. The court summarily granted the motion for the reasons MAE put forth.

At the summary judgment stage, we must reverse the district court's ruling, despite the discretion we afford district courts on evidentiary issues. *See Hall v. United Ins. Co. of Am.,* 367 F.3d 1255, 1259 (11th Cir. 2004) (ruling that we reverse the district court's evidentiary rulings only when substantial prejudice exists). We have serious doubts as to the merits of many of MAE's objections. For instance, MAE moved to strike the passage in which the plaintiffs wrote, "Though Mack has been employed at MAE for four years, he has never been selected to go to a systems educational course to learn the systems of an aircraft. In Mack's opinion, this hampers his ability to receive promotions and raises." MAE argued that "this passage contains Mack's speculation about the application of promotion policies to him." Presumably, MAE was attempting to argue that Mack's opinion was false and that his lack of education had not, in fact, affected his ability to be promoted.

We cannot affirm the striking of this passage in the plaintiffs' responsive pleading on this ground. Mack was permitted to testify as to his opinion because his testimony was "(a) rationally based on [his] perception . . . , (b) helpful to a

26

clear understanding of the issue, and (c) not based on scientific, technical, or other specialized knowledge . . . ." Fed. R. Evid. 701. Mack's opinion testimony was "predicated upon [his experience at MAE, which] he observed personally" and is "[an opinion] that a normal person might draw from those observations." *Argo Air Assocs., Inc. v. Houston Cas. Co.*, 128 F.3d 1452, 1456 (11th Cir. 1997) (citations and quotations omitted) (affirming the admission of lay witnesses' opinion testimony). MAE's objection was not appropriate at the summary judgment stage because it "went to the weight of the [testimony], not to its admissibility."[1] *See id.*

Furthermore, we cannot affirm the striking of any passage on the basis that it constitutes inadmissible hearsay evidence because the passages are not evidence at all–they are the plaintiffs' *arguments* in their responsive pleading. For example, MAE objected to the passage in which the plaintiffs wrote that "Charles Gennaro, a supervisor, did not inform Wayne that he was required to see Bell or Wellington per MAE's harassment policy," on the grounds that it was inadmissible hearsay evidence. This objection lacks merit for two reasons. First, the passage is the plaintiffs' argument. It is not evidence. If MAE wanted to object to portions of the

---

[1]MAE also moved to strike the following passage: "[I]n late 2003 McDonald was shown by Jimmy Jones, a former MAE inspector, three photographs of nooses on MAE property. . . . In McDonald's opinion, such graffiti is overt and prevalent throughout the facility." MAE argued that this passage was inadmissible opinion testimony that "invades the province of the jury." We cannot affirm the striking of this passage because it, too, constitutes opinion testimony based on personal observation and experience.

27

plaintiffs' testimony as inadmissible hearsay, it should have moved to strike the depositions themselves–not the plaintiffs' opposition to summary judgment.

Second, Wayne's testimony that Gennaro did not tell him that the company's EEO Policy required him to report harassment to Managers Bell or Wellington is not hearsay. At his deposition, Wayne was asked, "[w]hen you complained to . . . Charlie Gennaro about Robert Craft, did [he] say to you, 'Hey, wait a minute, you can't complain to [me], you've got to go to George Bell or Dick Wellington?'" Wayne replied, "No, sir, never." Wayne's testimony is not "a statement . . . offered in evidence to prove the truth of the matter asserted," Fed. R. Evid. 801(c), because it is not a "statement" at all. A "statement" for purposes of the hearsay rule is "an oral or written assertion." Fed. R. Evid. 801(a)(1). Wayne did not testify as to any "oral or written assertion" by Gennaro.

The problem with the court's ruling on this motion was the parties' failure to argue fully the merits of MAE's objections, coupled with the court's summary striking of each passage in the plaintiffs' responsive pleading. Many of MAE's objections were to lengthy passages, which referenced multiple statements by the plaintiffs. The court should have analyzed and ruled on each particularized objection as to each statement. The court's failure to do so leaves us with an inadequate basis upon which to judge the court's ruling. We refuse to affirm the

28

striking of a significant portion of the plaintiffs' argument in their responsive pleading without a proper understanding of the basis upon which the district court ruled and without any underlying motions to strike portions of the depositions. Accordingly, the district court's blanket declaration that "the statements at issue are inadmissible hearsay, double hearsay, opinion, speculation and/or conjecture" was an abuse of discretion.

## C.    Disparate Treatment Claims

Finally, we consider whether the district court erred in entering summary judgment on each of the plaintiff's claims of disparate treatment in the terms and conditions of their employment. We use the traditional *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973) burden-shifting analysis to evaluate these claims. First, the plaintiff must raise an inference of discrimination through his prima facie case. *Id.* at 802, 93 S. Ct. at 1824. To establish a prima facie case of disparate treatment, the plaintiff must show that: (1) he belongs to a racial minority; (2) he was subjected to an adverse job action; (3) his employer treated similarly situated employees outside his classification more favorably; and (4) he was qualified to do the job. *Id.* The burden then shifts to the defendant to "articulate some legitimate nondiscriminatory reason" for the alleged discrimination. *Id.* Once the defendant produces such a reason, the plaintiff must

29

then prove that the legitimate reason was a mere pretext for discrimination. *Id.* at 804, 93 S. Ct. at 1826. To avoid summary judgment, the plaintiff must produce sufficient evidence to show "that the employer intentionally discriminated against him because of his race." *Holifield v. Reno*, 115 F.3d 1555, 1565 (11th Cir. 1997) (per curiam).

### 1.    Mack's Disparate Pay Claim

Plaintiff Mack alleged that his starting pay at MAE was less than similarly-situated white employees, Joshua Frye, Matthew Wicks, Larry Givens, and Michael Musante. He argued that he was hired at $9.50 per hour as an Apprentice, while the others were hired at $10.50 or $11 per hour for the same position. To establish a prima facie case, Mack must demonstrate that "similarly situated comparators outside the protected class received higher compensation." *Cooper*, 390 F.3d at 735.

We affirm the court's entry of summary judgment as to this claim because MAE produced uncontroverted evidence that Frye and Wicks were paid more than Mack because each had specialized experience and training in aeronautics and avionics, while Mack had only general electronic training. Consequently, Mack failed to show that they were "similarly situated in all relevant respects." *Knight v. Baptist Hosp., Inc.*, 330 F.3d 1313, 1316 (11th Cir. 2003) (per curiam) (citations

30

and quotations omitted). Nor did Mack demonstrate that Givens was a similarly situated comparator because he failed to present any admissible evidence as to Givens's salary. Mack's third comparator, Musante, was hired as a Mechanic I–not as an Apprentice–based on MAE's initial evaluation of his experience. Musante's 90-day skill level evaluation revealed that he was not performing at the requisite skill level of a Mechanic I, so MAE reclassified him as an Apprentice but did not lower his pay, consistent with the company's PPM. The fact that MAE initially misjudged Musante's qualifications does not show intentional race discrimination. *Silvera v. Orange County Sch. Bd.*, 244 F.3d 1253, 1261 (11th Cir. 2001) (ruling that an employer's actions based on a mistaken, non-discriminatory belief do not violate Title VII). Mack's "opinion [that he was discriminated against], without more, is not enough to establish a prima facie case of race discrimination." *Holifield*, 115 F.3d at 1564.

### 2. Mack's Failure to Promote Claim

Plaintiff Mack also alleged that he was denied a skill-level promotion from Apprentice to Mechanic I because of his race, while three white Apprentices (Frye, Wicks, and Givens) were promoted after their initial six-month evaluation. To establish a prima facie case, Mack must show that he was qualified for the skill level promotion by demonstrating that he satisfied MAE's reasonable

31

qualifications for the position. *See Cooper,* 390 F.3d at 741-43 (ruling that the plaintiff's own opinion of her qualifications for progression, without more, was insufficient to overcome the employer's judgment that she was not qualified).

We affirm the court's entry of summary judgment on this claim because the record revealed that Mack was not eligible for a promotion at six months under MAE's PPM because he did not have the required average performance evaluation score of at least 5.0. Mack's average was 4.9, while the alleged comparators' averages were all 5.0 or higher. Therefore, Mack failed to demonstrate that he was qualified for the skill-level promotion.

Mack also argued that he once again was denied a promotion from Apprentice to Mechanic I after one year of employment because of his race. Mack offered as evidence of discrimination Lead Holbrook's statement that the reason why his promotion had been delayed was because "you're the wrong fucking color."

Here, Mack established a prima facie case of failure to promote. However, Mack did not offer sufficient evidence of pretext to rebut MAE's legitimate, non-discriminatory reason for its failure to promote him–that MAE mistakenly failed to perform his one-year evaluation, and that after it discovered the mistake, it promoted Mack to Mechanic and paid him full back pay to account for the missing

32

evaluation. Holbrook's statement is insufficient to show pretext because there was no evidence that Holbrook was involved in any decisionmaking regarding Mack's promotion, that Holbrook was Mack's supervisor at the time of the evaluation, or that Holbrook's statement was based on his knowledge of discrimination by any other supervisor. Standing alone, this statement is insufficient to raise a genuine issue of fact on pretext. Therefore, we affirm the district court's entry of summary judgment on this claim.

### 3. George's Claim of Disparate Discipline

Plaintiff George claimed that he was demoted from Acting Lead to Mechanic because of his race. He alleges that white Acting Leads, including Elliot Lambert, Jeremy Lewis, and Scott Schnoes, were involved in the same kind of incidents that led to his demotion, but they were not similarly demoted. In this context, we consider "whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Maynard v. Bd. of Regents of the Univ. of Fla. Dep't of Educ.*, 342 F.3d 1281, 1289 (11th Cir. 2003) (citations and quotations omitted). "We require that the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999).

33

We affirm summary judgment on this claim. George was not similarly situated to Acting Leads Lambert and Lewis because, although all three were involved in an incident causing aircraft damage, Lambert and Lewis were working under the supervision of a different Program Manager–not the Program Manager who decided to demote George. *See Silvera*, 244 F.3d at 1261 n.5 (ruling that "differences in treatment by different supervisors or decision makers can seldom be the basis for a viable claim of discrimination"). Moreover, George's Program Manager demoted him for the additional reasons that he was dissatisfied with the work pace of George's crew and that George did not supervise his crew closely enough. Accordingly, George was not similarly situated to Lambert and Lewis because the "quantity and quality of [their] misconduct [was] [not] nearly identical." *Maniccia*, 171 F.3d at 1368. George was not similarly situated to Schnoes either because the two were not subject to the same standards of conduct. *See Holifield*, 115 F.3d at 1562 (ruling that comparators must be "similarly situated in all relevant aspects"). Although both George and Schnoes worked under the same Program Manager, Schnoes was a Permanent Lead–not an Acting Lead. MAE presented uncontroverted evidence that the same considerations do not dictate removal of a Permanent Lead, and that removal of an Acting Lead is a fairly common occurrence.

### 4. George's Failure to Promote Claim

Plaintiff George claimed that he was denied a competitive promotion to Project Manager because of his race and that Darren Macip, a white male, was selected despite his inferior qualifications. MAE did not consider George for the promotion because it had no record of him ever applying for the position and did not receive his application.

We affirm summary judgment as to this claim because George did not present evidence that MAE's legitimate, non-discriminatory reason for not selecting him was pretextual. George did not present any evidence that MAE intentionally misplaced or discarded George's application for Project Manager because of his race, or for any other reason. "A plaintiff must show not merely that the defendant's employment decisions were mistaken, but that they were in fact motivated by [race]." *Lee v. GTE Fla., Inc.*, 226 F.3d 1249, 1253 (11th Cir. 2000) (per curiam).

### 5. Mallory's Claims of Disparate Treatment regarding OJT Records and Failure to Train

Plaintiff Mallory alleged that white leads in his department, Scott Palmer and Jim Walsh, hampered his promotional opportunities at MAE by intentionally losing or manipulating his "on-the-job training" ("OJT") records. OJT records are company forms on which employees record the type of work that they perform on

35

a particular project and are used for determining promotions. Mallory also alleged that Walsh refused to train him on the computer, while he trained white employees.

We affirm the district court's entry of summary judgment on these claims because Mallory failed to put forth evidence of any similarly-situated white employee who was treated more favorably in terms of managing OJT records or training. Moreover, Mallory failed to establish that he suffered an adverse employment action. An adverse employment action must involve "an ultimate employment decision . . . or other conduct that alters the employee's compensation, terms, conditions, or privileges of employment, deprives him . . . of employment opportunities, or adversely affects his . . . status as an employee." *Gupta*, 212 F.3d at 587 (citation and quotation omitted). Mallory did not produce any evidence that MAE's mismanagement of his OJT records or its failure to train him on the computer had any adverse affect on his employment.

### 6. McDonald's Claim of Disparate Discipline

Plaintiff McDonald alleged that he was suspended for three days without pay for his role in an incident that resulted in substantial damage to an aircraft, while white employees who were also involved in the incident were not disciplined. McDonald also alleged that he received a written disciplinary report for insubordination when white employees who engaged in the same conduct were not

36

similarly disciplined.  Here, we consider the "nature of the offenses committed and the nature of the punishments imposed."  *Silvera*, 244 F.3d at 1259 (citations and quotations omitted).

We affirm the district court's entry of summary judgment regarding McDonald's three-day suspension because MAE's investigation concluded that both McDonald and Program Manager James Winkler, a white male, were partially at fault and both received a three-day suspension.  McDonald failed to show that a similarly-situated white employee was treated more favorably.  We also affirm as to McDonald's claim regarding the disciplinary report he received for insubordination.  MAE presented uncontroverted evidence that it investigated McDonald's complaint that the discipline was unfair and rescinded the discipline.  A disciplinary report does not rise to the level of an adverse employment action where the employer rescinds its decision to take action before the employee suffers a tangible harm.  *See Pennington v. City of Huntsville*, 261 F.3d 1262, 1267 (11th Cir. 2001).

### 7. Wayne's Claim of Disparate Treatment regarding Work Opportunities and OJT Records

Plaintiff Wayne alleged that two white supervisors lost or otherwise mismanaged his OJT records, which resulted in lost promotional opportunities for him.  Wayne does not identify the white employees who were treated more

favorably than him, nor does he identify which promotions he believes he was denied. Accordingly, we affirm the court's entry of summary judgment on this claim because he has failed to show that similarly-situated white employees were treated more favorably than him. He has also failed to show that he suffered an adverse employment action as a result of the mismanagement of his OJT records.

Wayne also alleges that he was required to take "credit time" off when work was slow, while similarly-situated white employees were assigned to perform jobs elsewhere. For example, he alleges that he was denied the opportunity to work on the new "sink lock" 747 project, while a white crew was assigned the job. We affirm summary judgment on this claim because Wayne provided no evidence to support his claim other than his speculation. To avoid summary judgment, Wayne "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986). Meanwhile, MAE provided uncontroverted evidence that a significant number of white employees were required to take "credit time" off during the same time frame when work was slow. Therefore, Wayne failed to show that similarly-situated white employees were treated more favorably.

III. CONCLUSION

In conclusion, we reverse the entry of summary judgment on the plaintiffs' hostile work environment claim and MAE's *Faragher* defense because, viewing the entirety of the record, in the light most favorable to the plaintiffs, there remain genuine issues of material fact. We remand the hostile work environment claim and the *Faragher* defense for trial. We reverse the district court's ruling granting MAE's motion to strike portions of the plaintiffs' responsive pleading opposing summary judgment. At trial, the district court will need to address separately each portion of the disputed testimony if and when the plaintiffs present such testimony and if and when MAE objects to the admission of such testimony. Finally, we affirm the entry of summary judgment on each of the plaintiffs' disparate treatment claims for the reasons stated.

**AFFIRMED in part, REVERSED and REMANDED in part.**