07-0016-cv
The Presbyterian Church of Sudan v. Talisman Energy, Inc.

**UNITED STATES COURT OF APPEALS**

**FOR THE SECOND CIRCUIT**

August Term, 2008

(Argued: January 12, 2009      Decided: October 2, 2009)

Docket No. 07-0016-cv

- - - - - - - - - - - - - - - - - - - -x

THE PRESBYTERIAN CHURCH OF SUDAN,
REV. MATTHEW MATHIANG DEANG,
REV. JAMES KOUNG NINREW, NUER
COMMUNITY DEVELOPMENT SERVICES IN U.S.A,
FATUMA NYAWANG GARBANG, NYOT TOT RIETH,
individually and on behalf of the estate
Of her husband JOSEPH THIET MAKUAC,
STEPHEN HOTH, STEPHEN KUINA, CHIEF
TUNGUAR KUEIGWONG RAT, LUKA AYUOL YOL,
THOMAS MALUAL KAP, PUOK BOL MUT, CHIEF
PATAI TUT, CHIEF PETER RING PATAI, CHIEF
GATLUAK CHIEK JANG, YIEN NYINAR RIEK AND
MORIS BOL MAJOK, on behalf of themselves
and all others similarly situated,

　　　　Plaintiffs-Appellants,

　　　　-v.-　　　　　　　　　　　　　　　　07-0016-cv

TALISMAN ENERGY, INC.,

　　　　Defendant-Appellee,

REPUBLIC OF THE SUDAN,

　　　　Defendant.

- - - - - - - - - - - - - - - - - - - -x

Before: JACOBS, Chief Judge, LEVAL and CABRANES, Circuit Judges.

Appeal from a grant of summary judgment in favor of Talisman Energy, Inc. ("Talisman") on Plaintiffs-Appellants' claims under the Alien Tort Statute. The United States District Court for the Southern District of New York (Cote, J.) held that to establish accessorial liability for violations of the international norms prohibiting genocide, war crimes, and crimes against humanity, plaintiffs were required to prove, inter alia, that Talisman provided substantial assistance to the Government of the Sudan with the purpose of aiding its unlawful conduct. We agree, and affirm dismissal on the ground that plaintiffs have not established Talisman's purposeful complicity in human rights abuses.

PAUL L. HOFFMAN, Schonbrun
DeSimone Seplow Harris &
Hoffman, Venice, CA (Adrienne J.
Quarry, Schonbrun DeSimone
Seplow Harris & Hoffman, Venice,
CA; Carey D'Avino, Stephen
Whinston, and Keino Robinson,
Berger & Montague, P.C.,
Philadelphia, PA; Lawrence Kill,
John O'Connor, and Stanley
Bowker, Anderson Kill & Olick,
P.C., New York, NY; Daniel E.
Seltz, Steven E. Fineman, and
Rachel Geman, Lieff, Cabraser,
Heimann & Bernstein, LLP, New

York, NY on the brief), for Plaintiffs-Appellants

MARC J. GOTTRIDGE (Joseph P. Cyr, Scott W. Reynolds, Andrew M. Behrman, on the brief), Lovells, New York, NY, for Defendant-Appellee

RALPH STEINHARDT, Professor of Law, George Washington University Law School, Washington, DC (William J. Aceves, Professor of Law, California Western School of Law, San Diego, CA, on the brief) for Amici Curiae International Law Scholars in Support of Appellants

RICHARD L. HERZ (Marco B. Simons, on the brief), Earthrights International, Washington, DC, for Amicus Curiae Earthrights International in Support of Plaintiffs-Appellants and Reversal

Judith Brown Chomsky and Michael Poulshock, Law Office of Judith Brown Chomsky, Elkins Park, PA, and Jennifer M. Green and Katherine Gallagher, Center for Constitutional Rights, New York, NY, for Amicus Curiae on Civil Conspiracy and Joint Criminal Enterprise in Support of Plaintiffs-Appellants and in Support of Reversal of the District Court's Opinion

Terrence P. Collingsworth, Derek Baxter, and Natacha Thys,

International Labor Rights Fund, Washington, DC, <u>for Amicus Curiae International Labor Rights Fund in Support of Plaintiffs-Appellants</u>

Mark Diamond, Counsel for Amici Curaie, New York, NY, <u>for Amici Curiae Lexiuste Cajuste, Neris Gonzalez, Zenaida Velásquez Rodriquez, and Francisco Calderon in Support of Plaintiffs-Appellants Urging Reversal</u>

Renee C. Redman, Legal Director, American Civil Liberties Union Foundation of Connecticut, Hartford, CT, <u>for Amici Curiae Canadian Parliamentarians in Support of the Appellants</u>

Jonathan W. Cuneo and R. Brent Walton, Cuneo Gilbert & LaDuca, LLP, Washington, DC, <u>for Amici Curiae The Rt. Reverand Keith L. Ackerman, SSC, Bishop, Diocese of Quincy, the Episcopal Church; Christian Solidarity International-USA; Coalition for the Defense of Human Rights; Family Research Council; Institute on Religion & Democracy; Renew Network; Servant's Heart; Sudan Advocacy Action Forum; Sudan Sunrise; and Trinity Presbytery's Sudan Ministry in Support of Appellants</u>

LEWIS S. YELIN, Attorney, Appellate Staff, Civil Division, U.S. Department of Justice, Washington, DC (Michael J.

4

Garcia, United States Attorney, and David S. Jones, Assistant United States Attorney, Southern District of New York, New York, NY, John B. Bellinger III, Legal Advisor, Department of State, Washington, DC, Jeffrey S. Bucholtz, Acting Assistant Attorney General, and Douglas N. Letter and Robert M. Loeb, Attorneys, Appellate Staff, Civil Division, U.S. Department of Justice, Washington, DC, on the brief), for Amicus Curiae United States

SAMUEL ESTREICHER, NYU School of Law, New York, NY (Michael D. Ramsey, University of San Diego School of Law, San Diego, CA on the brief), for Amici Curiae Professors of International Law, Federal Jurisdiction and the Foreign Relations Law of the United States in Support of Defendant-Appellee

Karen M. Asner and Milana Salzman, White & Case LLP, New York, NY, for Amicus Curiae the Government of Canada in Support of Dismissal of the Underlying Action

Robin S. Conrad and Amar D. Sarwal, National Chamber Litigation Center, Inc., Washington, DC, and John Townsend Rich, Paul R. Friedman, and William F. Sheehan, Goodwin Proctor LLP, Washington, DC for Amicus Curiae the Chamber of Commerce of the United States of America in Support of Defendant-

Appellee Talisman Energy, Inc. and in Support of Affirmance

Daniel J. Popeo and Richard A. Samp, Washington Legal Foundation, Washington, DC for Amici Curiae Washington Legal Foundation and Allied Educational Foundation in Support of Defendant/Appellee, Urging Affirmance

James J. Dillon, Foley Hoag LLP, Boston, MA, Janet Walker, Professor of Law, Osgood Hall Law School of York University, Toronto, Ontario, Canada, and H. Scott Fairley, Theall Group LLP, Toronto, Ontario, Canada, for Amici Curiae the Canadian Chamber of Commerce; the Mining Association of Canada; the Canadian Association of Petroleum Producers; and the Prospectors and Developers Association of Canada in Support of Defendant-Appellee

James J. Dillon, Foley Hoag LLP, Boston, MA, for Amici Curiae The National Foreign Trade Council; The Independent Petroleum Association of America; and The United States Council for International Business in Support of Defendant-Appellee

Christopher Greenwood, CMG, QC, Essex Court Chambers, London, United Kingdom, for Amicus Curiae Professor Christopher Greenwood, CMG, QC, in Support of Defendant-Appellee

6

James Crawford, Whewell Professor of International Law, University of Cambridge, Cambridge, United Kingdom, <u>for Amicus Curiae Professor James Crawford in Support of Defendant-Appellee</u>

DENNIS JACOBS, <u>Chief Judge</u>:

Plaintiffs-Appellants are Sudanese who allege that they are victims of human rights abuses committed by the Government of the Sudan in Khartoum ("the Government") and that Talisman Energy, Inc. ("Talisman"), a Canadian corporation, aided and abetted or conspired with the Government to advance those abuses that facilitated the development of Sudanese oil concessions by Talisman affiliates. Plaintiffs appeal from a judgment of the United States District Court for the Southern District of New York (Cote, <u>J.</u>) dismissing their claims under the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350.

We hold that under the principles articulated by the United States Supreme Court in <u>Sosa v. Alvarez-Machain</u>, 542 U.S. 692 (2004), the standard for imposing accessorial liability under the ATS must be drawn from international law; and that under international law, a claimant must show that the defendant provided substantial assistance with the

7

purpose of facilitating the alleged offenses.  Applying that standard, we affirm the district court's grant of summary judgment in favor of Talisman, because plaintiffs presented no evidence that the company acted with the purpose of harming civilians living in southern Sudan.

It becomes necessary to set out at some length the background of the hostilities in the Sudan; the history of the oil enterprise, its facilities and corporate structure; the security measures taken by the enterprise and by the Government; the injuries and persecutions alleged; and the extent and nature of Talisman's connection to the human rights abuses.

**BACKGROUND**

**A.  Civil War in the Sudan**

At the time Sudan obtained its independence from Britain and Egypt in 1956, civil war broke out between the Arab-dominated Islamic regime in the north, and the non-Muslim African population in the south.[1]  In 1972, the two

---

[1] The facts are set forth in detail in the district court's summary judgment decision.  See Presbyterian Church of Sudan v. Talisman Energy, Inc., 453 F. Supp. 2d 633, 641-61 (S.D.N.Y. 2006).  We recount only those facts that bear upon the disposition of the appellate issues.

sides reached a power-sharing agreement in Addis Ababa, Ethiopia, after which relative stability ensued until an anti-Government uprising in 1983.

In 1991, southern rebels fractured, and the factions fought the Government and each other, with large-scale displacement and death among civilians.

In April 1997, the Government signed the Khartoum Peace Agreement ("KPA") with several (but not all) of the southern rebel groups.  The KPA provided for religious freedom, a cease-fire, sharing of resources and power between the north and south, creation of a "Coordinating Council" of factions in southern Sudan, and the consolidation of most of the rebel militias into the South Sudan Defense Force ("SSDF"), which was aligned with the Government, but with a measure of autonomy and control in the south.  The benefits of this agreement were short-lived: the SSDF split into warring factions by 1998, and competing militia groups continued fighting each other and the Government.  This violence continued throughout the time that Talisman operated in the Sudan.

**B.  Oil Development in the Sudan**

After Chevron discovered oil in southern Sudan in 1979,

9

the Government granted development rights to foreign companies for six numbered "blocks."

In August 1993, a Canadian company named State Petroleum Company ("SPC") purchased the rights to develop blocks 1, 2, and 4. In 1994, SPC was acquired by, and became a wholly owned subsidiary of, another Canadian company, Arakis Energy Corporation ("Arakis").

In December 1996, SPC formed a consortium with three other companies: China National Petroleum Corporation ("CNPC"), Petronas Carigali Overseas SDN BHD ("Petronas"), and Sudapet, Ltd. ("Sudapet") (collectively "the Consortium"), which were wholly owned by China, Malaysia, and the Republic of the Sudan, respectively. The Consortium members signed agreements among themselves and with the Government concerning oil exploration, production, and development, as well as the construction of a pipeline from the Consortium's concession area to the Red Sea. More than half of the Consortium's profits accrued to the Government.

The Consortium members conducted operations through a Mauritius corporation, called the Greater Nile Petroleum Operating Company Limited ("GNPOC"), which was owned 40% by CNPC, 30% by Petronas, 25% by SPC, and 5% by Sudapet.

## C. Talisman's Purchase of Arakis

In October 1998, Talisman acquired Arakis and its 25% stake in GNPOC.  The purchase of Arakis was effectuated through Talisman's indirect subsidiary, State Petroleum Corporation B.V., which was later renamed "Talisman (Greater Nile) B.V." ("Greater Nile") on December 10, 1998.  Greater Nile was a wholly-owned subsidiary of Goal Olie-en-Gasexploratie B.V., which at the time was wholly owned by British companies.  The British companies were wholly owned subsidiaries of Talisman Energy (UK) Limited, which was a direct and wholly owned subsidiary of Talisman.

Before purchasing Arakis, Talisman engaged in several months of due diligence: meetings between senior Talisman executives and governmental and security officials in the Sudan; conversations with GNPOC employees and visits to GNPOC development sites; reports on security conditions in the country; roundtable discussions in Canada with representatives of non-governmental organizations, church groups, and other stakeholders; and consultations with representatives of the British government, which controlled the Sudan in condominium with Egypt from 1899 to 1956.

Among their many meetings, Talisman CEO Jim Buckee and

11

other Talisman officers met with Riek Machar ("Machar"), then the First Assistant to the President of the Sudan and head of the Southern Sudan Coordinating Council ("SSCC") and the SSDF. Sudanese officials, including Machar and Unity State Governor Taban Deng Gai, provided assurances concerning safety, security, and peace.

Robert Norton, the head of security for Arakis in the Sudan from 1994 to 1998, advised Talisman that the oil fields were protected both by the military and by Government-sponsored militias. Norton opined that, though Talisman's assistance would greatly advance oil exploration, it would tip the military balance in favor of the Government. Norton believed that Talisman should not invest in the Sudan.

A representative of Freedom Quest International also discouraged Talisman from investing in the Sudan, warning senior Talisman officials that GNPOC and the Government used the Sudanese military to expel civilian populations from villages in order to create a "cordon sanitaire" ("buffer zone") around oil fields.

**D. Security Arrangements for GNPOC**

Because GNPOC's operations took place amidst civil war,

security arrangements were made for Consortium personnel in coordination with the Government and military forces. Plaintiffs contend that these arrangements resulted in the persecution of civilians living in or near the oil concession areas.

In May 1999, GNPOC and the Government built all-weather roads traversing the oil concession areas and linking the concessions to military bases. To protect GNPOC's employees and equipment, these roads served the dual purposes of moving personnel for oil operations and facilitating military activities. According to plaintiffs, these roads enabled the military to operate year-round in areas prone to seasonal flooding, enhancing the military's ability to launch attacks.

In 1999-2000, GNPOC upgraded two airstrips in the concessions--Heglig and Unity--for the safety and convenience of GNPOC personnel. The improvements also had the effect of supporting military activity, because the Government began using the airstrips to supply troops, take defensive action, and initiate offensive attacks.

Heglig, in particular, was used extensively by the military. Talisman employees saw outgoing flights by

helicopter gunships and Antonov bombers.  One Talisman security advisor observed 500-pound bombs being loaded on Government-owned Antonov bombers at Heglig and regular bombing runs from the airstrip.  At both Heglig and Unity, GNPOC personnel refueled military aircraft, sometimes with GNPOC's own fuel.

During the time that Greater Nile was a member of the Consortium, it employed former soldiers as security advisors who traveled throughout the concession areas, coordinated with Mohammed Mokhtar (the former Sudanese Army colonel who served as head of GNPOC security), and wrote detailed reports for senior Talisman officials.[2]

Talisman CEO Buckee was aware of the military's activities from GNPOC airstrips.  In February 2001, he wrote to Sudanese Minister of National Defense Major General Bakri Hassan Saleh urging restraint in the Government's military activities and warning that whatever "the military objectives may be, the bombings are [universally] construed

---

[2] Talisman argues that security reports prepared for Greater Nile are inadmissible because of "multiple levels of hearsay lurking" in the documents and the absence of a hearsay exception allowing for their admission.  We do not reach this question, because even assuming the reports would be admissible in their entirety, they would not defeat summary judgment.

as violations of international humanitarian law." Greater Nile employees expressed concern to Mokhtar and Government officials about bombers and helicopter gunships using the airstrips.

Notwithstanding occasional breaks, the military continued to use the facilities. After a missile attack on the Heglig facility in August 2001, Buckee dropped his objection to the presence of helicopter gunships, and a Greater Nile security officer wrote to the Government emphasizing the need for security at GNPOC's facilities.

**E.   Buffer Zone Strategy**

At the heart of plaintiffs' complaint is the allegation that the Government created a "buffer zone" around GNPOC facilities by clearing the civilian population to secure areas for exploration. Witness testimony and internal Talisman reports show evidence of forced displacement. For example, a 2002 Greater Nile report describing the "buffer zone" around the Heglig camp explained that "[t]he remaining nomads . . . are being 'encouraged' to complete their move through the area as soon as possible. The area within the security ring road while not a sterile area as found on security operations elsewhere . . . is moving in that

15

direction." A 1999 security report stated that "[t]he military strategy, driven it appears by the GNPOC security management, is to create a buffer zone, i.e. an area surrounding both Heglig and Unity camps inside which no local settlements or commerce is allowed."

**F. Greater Nile Inquiry into Expanding its Exploration Area**

Greater Nile explored options for drilling new wells within GNPOC's concession, but outside the small area secured by the military in which production was ongoing. Greater Nile considered expanding exploration notwithstanding its knowledge of the Government's buffer zone strategy. According to plaintiffs, decisions about where to explore "were based upon technical analysis of geological formations performed by Talisman employees in Calgary," without regard to the human consequences of expansion.

**G. Plaintiffs' Injuries**

The individual plaintiffs remaining in the case consist of current or former residents of southern Sudan who were injured or displaced by Government forces in attacks on communities in Blocks 1, 2, and 5A. The plaintiffs were subjected to assaults by foot soldiers, attackers on

16

horseback, gunships, and bombers. They testified at depositions, with varying degrees of certainty, as to whether the attacks were perpetrated by the Government.

The Presbyterian Church of Sudan asserts claims based on the destruction of its churches by the Government. Plaintiffs Rev. James Koung Ninrew, Chief Tunguar Kueigwong Rat, and Chief Gatluak Chiek Jang testified to seeing churches burned in the Government's attacks.

## H. Procedural History

In November 2001, the Presbyterian Church of Sudan and four individual plaintiffs purporting to represent a class of thousands of southern Sudanese filed a complaint against Talisman in the United States District Court for the Southern District of New York. Plaintiffs filed an amended complaint in February 2002 naming additional plaintiffs and adding the Government as a defendant. Plaintiffs' amended complaint alleged that Talisman (1) directly violated, (2) aided and abetted the Government of Sudan in violating, and (3) conspired with the Government of Sudan to violate customary international law related to genocide, torture, war crimes, and crimes against humanity. Plaintiffs subsequently abandoned the claim of direct liability and

17

elected to proceed against Talisman only on the claims of aiding and abetting and conspiracy.

**1.    Talisman's Motions to Dismiss**

The case was initially assigned to Judge Allen Schwartz.  In March 2003, Judge Schwartz issued a lengthy decision denying Talisman's motion to dismiss on numerous jurisdictional grounds.  Presbyterian Church of Sudan v. Talisman Energy, Inc., 244 F. Supp. 2d 289 (S.D.N.Y. 2003).

The case was reassigned to Judge Denise Cote after Judge Schwartz died in March 2003.  Plaintiffs filed a Second Amended Class Action Complaint in August 2003, which added plaintiffs.[3]

After the Supreme Court's decision in Sosa, and our decision in Flores v. Southern Peru Copper Corp., 414 F.3d 233 (2d Cir. 2003), defendants moved for judgment on the pleadings arguing that the decisions changed the landscape for ATS claims and required reconsideration of the conclusions that [i] corporations can be liable for violating the ATS, and [ii] accessorial liability is

---

[3] On August 27, 2004, after the submission of relevant discovery, the district court again denied a motion to dismiss for lack of personal jurisdiction. Presbyterian Church of Sudan v. Talisman Energy, Inc., No. 01 Civ. 9882(DLC), 2004 WL 1920978 (S.D.N.Y. Aug. 27, 2004).

18

recognized under the ATS. By decision dated June 13, 2005, the district court denied Talisman's motion. Presbyterian Church of Sudan v. Talisman Energy, Inc., 374 F. Supp. 2d 331 (S.D.N.Y. 2005).

Talisman again moved for judgment on the pleadings based on a letter from the United States Attorney, with attachments from the Department of State and Embassy of Canada expressing concern with the litigation. Presbyterian Church of Sudan v. Talisman Energy, Inc., No. 01 Civ. 9882(DLC), 2005 WL 2082846, at *1 (S.D.N.Y. Aug. 30, 2005). The Department of State advised that "considerations of international comity and judicial abstention may properly come into play" in view of Canada's objections to the litigation and the United States government's determination that Canadian courts were capable of adjudicating plaintiffs' claims. Id. at *2. Canada argued that the court's exercise of jurisdiction [i] infringed on its sovereignty, [ii] chilled its ability to use "trade support services as 'both a stick and carrot in support of peace,'" and [iii] violated traditional restraints on the exercise of extraterritorial jurisdiction. Id. at *1-2.

In August 2005, the district court denied Talisman's

19

motion.  Id. at *9.  As to dismissal on comity grounds, the court found an insufficient nexus between Canada's foreign policy and the specific allegations in the complaint because the litigation did not require judging Canada's policy of constructive engagement with the Sudan, but "merely" judging "whether Talisman acted outside the bounds of customary international law while doing business in Sudan."  Id. at *5-8.  The court also observed that Canadian courts are unable to consider civil suits for violations of the law of nations.  Id. at *7.

As to dismissal on political question grounds, the court emphasized that the State Department letter did not explicitly declare that the lawsuit would interfere with United States policy toward the Sudan or Canada, and the court concluded therefore that exercising jurisdiction would not unduly intrude on the authority of the executive branch.[4]  Id. at *8.

---

[4] In 2005, the district court denied two motions for class certification on the ground that plaintiffs failed to satisfy the "predominance requirement."  Presbyterian Church of Sudan v. Talisman Energy, Inc., 226 F.R.D. 456, 482-85 (S.D.N.Y. 2005); Presbyterian Church of Sudan v. Talisman Energy, Inc., No. 01 Civ. 9882(DLC), 2005 WL 2278076, at *1 (S.D.N.Y. Sep. 20, 2005).  The court explained that all class members would have to show "that the injuries for which they are claiming damages were actually caused by [a

20

**2.  Motions to Amend and for Summary Judgment**

In April 2006, plaintiffs filed a Proposed Third Amended Class Action Complaint.  Later that month (before the district court ruled on plaintiffs' motion), Talisman moved for summary judgment as to all claims.  On September 12, 2006, the district court granted Talisman's motion.  See Presbyterian Church of Sudan v. Talisman Energy, Inc., 453 F. Supp. 2d 633 (S.D.N.Y. 2006).

The district court first considered whether international law recognized conspiracy liability.  The court held that "the offense of conspiracy is limited to conspiracies to commit genocide and to wage aggressive war" and that international law does not recognize the doctrine of liability articulated in Pinkerton v. United States, 328 U.S. 640, 646-47 (1946).  Presbyterian Church of Sudan, 453 F. Supp. 2d at 663, 665.  The court observed that plaintiffs never brought a claim for "wag[ing] aggressive war" and that

Government campaign in the south]," which would require individual, fact-intensive inquiries, given the numerous factions of rebel groups and the fog of war.  Presbyterian Church of Sudan, 226 F.R.D. at 482.  Moreover, "damages to class members occurred over more than four years, a territory of many hundreds of square miles, . . . [and] through at least 142 separate incidents."  Presbyterian Church of Sudan, 2005 WL 2278076, at *3.

21

they had abandoned their genocide claim.  Id. at 665.

Nonetheless, the court addressed the genocide claim and held

that plaintiffs could not be made liable for a co-

conspirator's conduct solely because that conduct was

foreseeable.  Id.

The district court next considered plaintiffs' claim

that Talisman aided and abetted genocide, war crimes, and

crimes against humanity.  The court undertook to define the

elements of aiding and abetting liability under the ATS, and

concluded that they must be derived from international law.

The court comprehensively surveyed international law and

held that:

> To show that a defendant aided and
> abetted a violation of international law,
> an ATS plaintiff must show:
>
> 1) that the principal violated
> international law;
>
> 2) that the defendant knew of
> the specific violation;
>
> 3) that the defendant acted with
> the intent to assist that
> violation, that is, the
> defendant specifically directed
> his acts to assist in the
> specific violation;
>
> 4) that the defendant's acts had
> a substantial effect upon the
> success of the criminal venture;

and

        5) that the defendant was aware
        that the acts assisted the
        specific violation.

Id. at 668.

As to plaintiffs' genocide claim, the court held that whether or not genocide was taking place, plaintiffs had presented no evidence that Talisman was aware of the genocide, or, if it was, that Talisman intended to further it.  Id. at 669-70.

As to war crimes and crimes against humanity, the court identified the kinds of "substantial assistance" that Talisman allegedly provided in aid of these violations: "(1) upgrading the Heglig and Unity airstrips; (2) designating areas 'south of the river' in Block 4 for oil exploration; (3) providing financial assistance to the Government through the payment of royalties; (4) giving general logistical support to the Sudanese military; and (5) various other acts."  Id. at 671-72.

The court determined that the airstrips at Unity and Heglig were owned and operated by GNPOC--not Talisman--and that there was no evidence that Talisman upgraded or improved the airstrips.  Id. at 673.  Moreover, even if

23

plaintiffs could show that Talisman was involved, there is no evidence that it upgraded the airstrips with the intention that the Government would use them for missions that violate human rights. Id. at 674.

As to designating areas "south of the river" for exploration, the court determined that preliminary discussions about expanding operations did not violate international humanitarian law and that there was no evidence Talisman was involved in such discussions, let alone that it considered the expansion as a pretext for attacking civilians. Id. at 675.

As to Talisman's payment of royalties to the Government, the court found no admissible evidence of the relationship between oil profits and military spending. Id. Nonetheless, the court assumed the relationship, and held that such payments were not enough to establish liability in the absence of evidence that Talisman "specifically directed" payments to military procurement or that it intended to aid attacks. Id. at 676.

As to the construction of all-weather roads and the provision of fuel to the military, the court concluded that the assistance was provided by GNPOC, not Talisman, which

24

had a limited presence on the ground.  Id. at 676-77.

Finally, the court addressed plaintiffs' allegations that Talisman assisted the Government by "using its community development program as a cover for gathering military intelligence" and by publicly denying knowledge of human rights violations.  The court ruled that there was no admissible evidence of the former allegation, and concluded that the latter did not constitute "substantial assistance" in violation of international humanitarian law.  Id. at 677.

Although not necessary for deciding Talisman's motion, the court ruled on whether plaintiffs could show that their injuries were caused by attacks initiated from GNPOC airfields, finding that only three plaintiffs were "arguably" attacked with GNPOC assistance, id. at 677, and that there was an absence of admissible evidence as to which Government aircraft flew particular missions, id. at 678.

Further, plaintiffs' motion to amend the complaint was denied on the ground that plaintiffs could not show good cause to amend three years after the deadline for amendment set forth in the scheduling order.  Id. at 680.  The court went on, however, to discuss the merits of the amended complaint and whether it could survive a motion for summary

25

judgment (given that the discovery period had closed). The court conducted a comprehensive choice of law analysis, and concluded that [i] there was no basis for applying domestic federal law to plaintiffs' claims against foreign corporations, id. at 681-83, and [ii] plaintiffs could not pierce the corporate veils of Talisman's subsidiaries or hold GNPOC or the subsidiaries liable on theories of joint venture or agency, id. at 683-89.

Having prevailed on summary judgment, Talisman moved for partial judgment pursuant to Federal Rule of Civil Procedure 54(b), so that it could achieve finality in the case notwithstanding the Government's failure to enter an appearance. The district court granted Talisman's motion and entered judgment in favor of Talisman. See Presbyterian Church of Sudan v. Talisman Energy, Inc., No. 01 Civ. 9882(DLC), 2006 WL 3469542, at *2 (S.D.N.Y. Dec. 1, 2006). This appeal followed.

**DISCUSSION**

Plaintiffs argue that, in granting summary judgment, the district court drew inferences in favor of Talisman, excluded plaintiffs' evidence from consideration, and failed

to hold Talisman responsible for human rights abuses committed by its partners and agents.  This Court "review[s] de novo the district court's grant of summary judgment, drawing all factual inferences in favor of the non-moving party."  Paneccasio v. Unisource Worldwide, Inc., 532 F.3d 101, 107 (2d Cir. 2008).

**I**

The ATS provides that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."  28 U.S.C. § 1350.  Although the statute was passed as part of the Judiciary Act of 1789, it provided jurisdiction in only one case in its first 170 years.  Sosa, 542 U.S. at 712.  Invocation of the statute became more frequent after the issuance of Filártiga v. Peña-Irala, 630 F.2d 876 (2d Cir. 1980), which held "that deliberate torture perpetrated under color of official authority violates universally accepted norms of the international law of human rights, regardless of the nationality of the parties," and that the ATS "provides federal jurisdiction" over torture claims.  Id. at 878.  The

torturer was likened to the pirate and slave trader of old, "an enemy of all mankind."  Id. at 890.

Filártiga held "that courts must interpret international law not as it was in 1789, but as it has evolved and exists among the nations of the world today."  Id. at 881.  At the same time, Filártiga cautioned restraint: "[t]he requirement that a rule command the 'general assent of civilized nations' to become binding upon them all is a stringent one."  Id.  "It is only where the nations of the world have demonstrated that the wrong is of mutual, and not merely several, concern, by means of express international accords, that a wrong generally recognized becomes an international law violation within the meaning of the statute."  Id. at 888.

In Kadic v. Karadzic, 70 F.3d 232 (2d Cir. 1995), we concluded "that certain forms of conduct violate the law of nations whether undertaken by those acting under the auspices of a state or only as private individuals."  Id. at 239.  Kadic recognized that claims for genocide and war crimes against individuals could proceed without state action.  Id. at 244.

In Flores, we surveyed the state of ATS case law and

engaged in a detailed analysis of the ATS and related principles of international law. Flores distilled three elements required to state a claim under the ATS: "plaintiffs must (i) be 'aliens,' (ii) claiming damages for a 'tort only,' (iii) resulting from a violation 'of the law of nations' or of 'a treaty of the United States.'" 414 F.3d at 242 (quoting 28 U.S.C. § 1350). We again issued a caution: "in determining what offenses violate customary international law, courts must proceed with extraordinary care and restraint." Id. at 248. The decisive issue in this case is whether accessorial liability can be imposed absent a showing of purpose. To answer this question "'we look primarily to the formal lawmaking and official actions of States and only secondarily to the works of scholars as evidence of the established practices of States.'"[5] Id. at

---

[5] Flores cited Article 38 of the Statute of the International Court of Justice, which provides that courts should look to the following sources of international law:

> a. international conventions, whether general or particular, establishing rules expressly recognized by the contesting states;
>
> b. international custom, as evidence of a general practice accepted as law;
>
> c. the general principles of law recognized by civilized nations;

29

250 (quoting United States v. Yousef, 327 F.3d 56, 103 (2d Cir. 2003)).  After a thorough review of these sources, Flores concluded that the alleged prohibition on "intranational pollution" and "rights to life and health [were] insufficiently definite to constitute rules of customary international law."  Id. at 254-55.

The United States Supreme Court has analyzed the ATS only once.  In Sosa, the Court explained that the ATS "was intended as jurisdictional in the sense of addressing the power of the courts to entertain cases concerned with a certain subject," 542 U.S. at 714, and that "[t]he jurisdictional grant is best read as having been enacted on the understanding that the common law would provide a cause of action for the modest number of international law violations with a potential for personal liability at the time," id. at 724.  Claims "based on the present-day law of

---

> d. subject to the provisions of Article 59, judicial decisions and the teachings of the most highly qualified publicists [i.e., scholars or "jurists"] of the various nations, as subsidiary means for the determination of rules of law.

414 F.3d at 251 (italics omitted)(quoting Statute of the International Court of Justice, June 26, 1945, art. 38, 59 Stat. 1055, 33 U.N.T.S. 993).

30

nations" should be recognized only if "accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms" contemporary with enactment of the ATS. Id. at 725.

Sosa cited five reasons for courts to exercise "great caution" before recognizing violations of international law that were not recognized in 1789:

> First, . . . the [modern] understanding that the law is not so much found or discovered as it is either made or created[;] . . . [s]econd, . . . an equally significant rethinking of the role of the federal courts in making it[;] . . . [t]hird, [the modern view that] a decision to create a private right of action is one better left to legislative judgment in the great majority of cases[;] . . . [f]ourth, . . . risks of adverse foreign policy consequences[; and] . . . fifth[,] . . . the lack of a] congressional mandate to seek out and define new and debatable violations of the law of nations.

Id. at 725-28. Thus, under Sosa, "the determination whether a norm is sufficiently definite to support a cause of action should (and, indeed, inevitably must) involve an element of judgment about the practical consequences of making that cause available to litigants in the federal courts." Id. at 732-33.

We have applied Sosa in four opinions addressing ATS

31

claims.  In three of them, we considered whether Sosa permitted recognition of particular offenses.  In Vietnam Ass'n for Victims of Agent Orange v. Dow Chemical Co., 517 F.3d 104 (2d Cir. 2008), we held that the manufacture and supply of an herbicide used as a defoliant (with collateral damage) did not violate international law: "[i]nasmuch as Agent Orange was intended for defoliation and for destruction of crops only, its use did not violate . . . international norms . . . , since those norms would not necessarily prohibit the deployment of materials that are only secondarily, and not intentionally, harmful to humans." Id. at 119-20.

Mora v. New York, 524 F.3d 183 (2d Cir. 2008), held that detention without notice of consular rights (in violation of Article 36(1)(b)(third) of the Vienna Convention on Consular Relations) did not violate a "well-accepted" international law norm.  Id. at 208-09.  But a divided panel held in Abdullahi v. Pfizer, Inc., 562 F.3d 163 (2d Cir. 2009), "that the prohibition in customary international law against nonconsensual human medical experimentation can[] be enforced through the ATS."  Id. at 169.

32

In the fourth case--Khulumani v. Barclay National Bank Ltd., 504 F.3d 254 (2d Cir. 2007)--we ruled in a per curiam opinion that "in this Circuit, a plaintiff may plead a theory of aiding and abetting liability under the [ATS]." Id. at 260.

                              II

Plaintiffs assert that Talisman aided and abetted (and conspired with) the Government in the commission of three violations of international law: [i] genocide, [ii] war crimes, and [iii] crimes against humanity. All three torts may be asserted under the ATS. Kadic, 70 F.3d at 236 ("[W]e hold that subject-matter jurisdiction exists[, and] that [defendant] may be found liable for genocide, war crimes, and crimes against humanity . . . ."); see also Sosa, 542 U.S. at 762 (Breyer, J., concurring in part and concurring in judgment)(describing a "subset" of "universally condemned behavior" for which "universal jurisdiction exists," including "torture, genocide, crimes against humanity, and war crimes"); Flores, 414 F.3d at 244 n.18 ("Customary international law rules proscribing crimes against humanity, including genocide, and war crimes, have

33

been enforceable against individuals since World War II.").

In Kadic, we defined "genocide" and "war crimes." Kadic adopted the definition of genocide from the Convention on the Prevention and Punishment of the Crime of Genocide art. 2, Dec. 9, 1948, 102 Stat. 3045, 78 U.N.T.S. 277 ("Genocide Convention"), which defines genocide as:

> any of the following acts committed with intent to destroy, in whole or in part, a national, ethnical, racial or religious group, as such:
>
> (a) Killing members of the group;
>
> (b) Causing serious bodily or mental harm to members of the group;
>
> (c) Deliberately inflicting on the group conditions of life calculated to bring about its physical destruction in whole or in part;
>
> (d) Imposing measures intended to prevent births with the group;
>
> (e) Forcibly transferring children of the group to another group.

Kadic, 70 F.3d at 241 (quoting Genocide Convention).

As to war crimes, Kadic applied the definition from Common Article 3 of the Geneva Convention, which "applies to 'armed conflict[s] not of an international character'" and requires "'each Party to the conflict'" to adhere to the following:

34

> Persons taking no active part in the hostilities . . . shall in all circumstances be treated humanely, without any adverse distinction founded on race, colour, religion or faith, sex, birth or wealth, or any other similar criteria.
>
> To this end, the following acts are and shall remain prohibited at any time and in any place whatsoever with respect to the above-mentioned persons:
>
> > (a) violence to life and person, in particular murder of all kinds, mutilation, cruel treatment and torture;
> >
> > (b) taking of hostages;
> >
> > (c) outrages upon personal dignity, in particular humiliating and degrading treatment;
> >
> > (d) the passing of sentences and carrying out of executions without previous judgment pronounced by a regularly constituted court . . . .

Kadic, 70 F.3d at 243 (alterations in original)(quoting Convention Relative to the Protection of Civilian Persons in Time of War art. 3, August 12, 1949, 6 U.S.T. 3516, 75 U.N.T.S. 287).  This standard applies to "all 'parties' to a conflict--which includes insurgent military groups."  Id.

We have never defined "crimes against humanity."  Here,

35

the district court adopted a generally serviceable definition, which the parties do not challenge and which we therefore, for purposes of this case, need not evaluate or edit: "[c]rimes against humanity include murder, enslavement, deportation or forcible transfer, torture, rape or other inhumane acts, committed as part of a widespread [or] systematic attack directed against a civilian population."[6] Presbyterian Church of Sudan, 453 F. Supp. 2d at 670.

Talisman does not contest that the enumerated torts are cognizable under the ATS. At issue is whether plaintiffs' claim that Talisman aided and abetted these offenses (and conspired to do them) is actionable under the ATS absent evidence that Talisman acted with the purpose of advancing the abuses, and, if proof of purpose is an element, whether the evidence supports such a finding.

                              **III**

There is no allegation that Talisman (or its employees)

---

[6] The district court used the phrase "widespread and systematic," but plaintiffs argue that this was error, and that "and" should be replaced by "or." (Pls.' Br. 65). We assume for purposes of this appeal that plaintiffs' formulation is correct.

36

personally engaged in human rights abuses; the allegation is that Talisman was complicit in the Government's abuses.

That allegation places in issue the standard for aiding and abetting liability under the ATS.[7] This question was presented to a prior panel, which held, in a brief per curiam opinion, that "in this Circuit, a plaintiff may plead a theory of aiding and abetting liability under the [ATS]." Khulumani, 504 F.3d at 260. However, the panel fractured as to the standard for pleading such liability.

Judge Katzmann, concurring, was of the view "that a defendant may be held liable under international law for aiding and abetting the violation of that law by another when the defendant (1) provides practical assistance to the principal which has a substantial effect on the perpetration of the crime, and (2) does so with the purpose of facilitating the commission of that crime." Id. at 277

---

[7] We address aiding and abetting liability--a concept typically associated with the criminal law--because customary international law norms prohibiting genocide, war crimes, and crimes against humanity have "been developed largely in the context of criminal prosecutions rather than civil proceedings." John Doe I v. Unocal Corp., 395 F.3d 932, 949 (9th Cir. 2002); see also Khulumani, 504 F.3d at 270 n.5 (Katzmann, J., concurring)("[O]ur case law . . . has consistently relied on criminal law norms in establishing the content of customary international law for purposes of the [ATS].").

37

(Katzmann, J., concurring). Judge Korman noted that (were he not dissenting on other grounds) he would have concurred with Judge Katzmann. Id. at 333 (Korman, J., concurring in part and dissenting in part). Both judges observed that the standard for aiding and abetting liability under the ATS must derive from international law sources. Id. at 268 (Katzmann, J., concurring); id. at 331 (Korman, J., concurring in part and dissenting in part).

Judge Hall's closely reasoned concurring opinion concluded that Sosa's reliance on international law applied to the question of recognizing substantive offenses, but not to the issue of secondary liability. On that issue, he found that "Sosa at best lends Delphian guidance," largely in dicta. Id. at 286 (Hall, J., concurring). Citing "a hornbook principle that international law does not specify the means of its domestic enforcement," id. (internal quotation marks omitted), Judge Hall turned to the Restatement (Second) of Torts § 876(b), which states that the aiding and abetting standard should be [i] knowing [ii] encouragement [iii] that facilitated the substantive violation. Id. at 287-89.

The upshot of this split is that notwithstanding the

38

agreement of two judges, Judge Katzmann's view did not constitute a holding and is therefore not binding precedent. In this unusual circumstance, the issue remains live. This opinion draws substantially from Judge Katzmann's concurring opinion, and adopts his proposed rule as the law of this Circuit.

Judge Katzmann began by choosing the source of law that should provide the basis for an aiding and abetting standard.[8] He observed that this Court has "repeatedly emphasized that the scope of the [ATS's] jurisdictional grant should be determined by reference to international law." Id. at 269 (Katzmann, J., concurring)(citing Kadic, 70 F.3d at 238; Flores, 414 F.3d at 248; Filártiga, 630 F.2d at 887). Similarly, footnote 20 of Sosa,[9] while nominally concerned with the liability of non-state actors, supports

_____

[8] Judge Katzmann's individual opinion contains a thorough discussion of aiding and abetting principles. This opinion sets forth only so much of Judge Katzmann's analysis as is necessary to provide the context of our holding. For an extended discussion of the aiding and abetting issue, see Khulumani, 504 F.3d at 268-77 (Katzmann, J., concurring).

[9] A consideration related to whether the ATS provides jurisdiction over a norm is "whether international law extends the scope of liability for a violation of a given norm to the perpetrator being sued, if the defendant is a private actor such as a corporation or individual." Sosa, 542 U.S. at 732 n.20.

39

the broader principle that the scope of liability for ATS violations should be derived from international law. Id. Judge Katzmann concluded that, while domestic law might provide guidance on whether to recognize a violation of international norms, it cannot render conduct actionable under the ATS. Id. at 270.

Judge Katzmann's research "revealed no source of international law that recognizes liability for aiding and abetting a violation of international law but would not authorize the imposition of such liability on a party who acts with the purpose of facilitating that violation (provided, of course, that the actus reus requirement is also satisfied)." Id. at 277. While liability had been imposed in certain cases under a less-stringent knowledge standard, see, e.g., id. at 277 n.12 (citing Prosecutor v. Vasiljevic, Case No. IT-98-32-A, Appeal Judgment, ¶ 102(ii) (Feb. 24, 2004)), Judge Katzmann cited Sosa's requirement that a norm obtain universal acceptance, and adopted the standard set forth in the Rome Statute: "that a defendant may be held liable under international law for aiding and abetting the violation of that law by another when the defendant (1) provides practical assistance to the principal

40

which has a substantial effect on the perpetration of the crime, and (2) does so with the purpose of facilitating the commission of that crime." Id. at 277.

We agree that Sosa and our precedents send us to international law to find the standard for accessorial liability. Plaintiffs argue that aiding and abetting liability is a matter ordinarily left to the forum country, where (in this venue) the principle is broad and elastic. But such an expansion would violate Sosa's command that we limit liability to "violations of . . . international law . . . with . . . definite content and acceptance among civilized nations [equivalent to] the historical paradigms familiar when § 1350 was enacted." 542 U.S. at 732. Recognition of secondary liability is no less significant a decision than whether to recognize a whole new tort in the first place.

Thus, applying international law, we hold that the mens rea standard for aiding and abetting liability in ATS actions is purpose rather than knowledge alone. Even if there is a sufficient international consensus for imposing liability on individuals who *purposefully* aid and abet a violation of international law, see Khulumani, 504 F.3d at

41

276 (Katzmann, J., concurring); cf. id. at 333 (Korman, J., concurring in part and dissenting in part), no such consensus exists for imposing liability on individuals who *knowingly* (but not purposefully) aid and abet a violation of international law.

Indeed, international law at the time of the Nuremberg trials recognized aiding and abetting liability only for purposeful conduct. See United States v. von Weizsaecker (The Ministries Case), in 14 Trials of War Criminals Before the Nuremberg Military Tribunals Under Control Council Law No. 10, at 662 (William S. Hein & Co., Inc. 1997)(1949)(declining to impose criminal liability on a bank officer who made a loan with the knowledge, but not the purpose, that the borrower would use the funds to commit a crime). That purpose standard has been largely upheld in the modern era, with only sporadic forays in the direction of a knowledge standard. See Khulumani, 504 F.3d at 276 (Katzmann, J., concurring)(noting that some international criminal tribunals have made overtures toward a knowledge standard but that the Rome Statute of the International Criminal Court adopts a purpose standard); see also id. at 332-37 (Korman, J., concurring in part and dissenting in

part).  Only a purpose standard, therefore, has the requisite "acceptance among civilized nations," Sosa, 542 U.S. at 732, for application in an action under the ATS. See generally Flores, 414 F.3d at 248 ("[I]n order for a principle to become part of customary international law, States must universally abide by it."); see also Yousef, 327 F.3d at 92, 105-08; Kadic, 70 F.3d at 239; Filártiga, 630 F.2d at 888.

**IV**

Plaintiffs allege that Talisman conspired with the Government to commit human rights abuses and argue that the district court failed to apply conspiracy principles from United States law to violations of international law under the ATS.  In particular, plaintiffs urge application of the Pinkerton doctrine, 328 U.S. at 646-47.[10]  Whether conspiracy claims are cognizable under international law is

---

[10] "[U]nder Pinkerton, a defendant may be found 'guilty on a substantive count without specific evidence that he committed the act charged if it is clear that the offense had been committed, that it had been committed in the furtherance of an unlawful conspiracy, and that the defendant was a member of that conspiracy.'"  United States v. Bruno, 383 F.3d 65, 89 (2d Cir. 2004) (quoting United States v. Miley, 513 F.2d 1191, 1208 (2d Cir. 1975)).

43

a question of first impression in this Circuit.

As a matter of first principles, we look to international law to derive the elements for any such cause of action.[11]  See Sec. III, supra.  In so doing, we must distinguish between the inchoate crime of conspiracy (which requires an agreement and overt acts, but no completed deed) and conspiracy as a theory of accessorial liability for completed offenses.

As to conspiracy as an inchoate offense, the Supreme Court held in Hamdan v. Rumsfeld, 548 U.S. 557, 610 (2006), that "the only 'conspiracy' crimes that have been recognized by international war crimes tribunals (whose jurisdiction often extends beyond war crimes proper to crimes against humanity and crimes against the peace) are conspiracy to commit genocide and common plan to wage aggressive war."

---

[11] Plaintiffs argue that federal conspiracy law should apply to ATS claims.  See, e.g., Cabello v. Fernandez-Larios, 402 F.3d 1148 (11th Cir. 2005) (applying domestic law to ATS conspiracy claim).  Judge Cote rejected that approach, holding that Sosa required applying international law.  Presbyterian Church, 453 F. Supp. 2d at 665 n.64.  We agree with Judge Cote.  Moreover, plaintiffs would fare no better if we adopted their preferred definition of conspiracy, because that definition (derived from domestic law) also requires proof "that . . . [the defendant] joined the conspiracy knowing of at least one of the goals of the conspiracy and intending to help accomplish it."  Cabello, 402 F.3d at 1159 (emphasis added).

44

Plaintiffs did not plead the waging of aggressive war, and while they did plead genocide, it is pled as a completed offense, not an inchoate one.

The analog to a conspiracy as a completed offense in international law is the concept of a "joint criminal enterprise." See Hamdan, 548 U.S. at 611 n.40. Even assuming, without deciding, that plaintiffs could assert such a theory in an ATS action, an essential element of a joint criminal enterprise is "a criminal intention to participate in a common criminal design." Prosecutor v. Tadic, Case No. IT-94-1-A, Appeal Judgment, ¶ 206 (July 15, 1999)(basing that finding on numerous precedents from criminal tribunals established in the aftermath of Word War II). Therefore, under a theory of relief based on a joint criminal enterprise, plaintiffs' conspiracy claims would require the same proof of mens rea as their claims for aiding and abetting.

In any event, plaintiffs have not established that "international law [universally] recognize[s] a doctrine of conspiratorial liability that would extend to activity encompassed by the Pinkerton doctrine." Presbyterian Church of Sudan, 453 F. Supp. 2d at 663.

**V**

Therefore, in reviewing the district court's grant of summary judgment to Talisman, we must test plaintiffs' evidence to see if it supports an inference that Talisman acted with the "purpose" to advance the Government's human rights abuses.

The district court's observations are well-considered and apt. "The activities which the plaintiffs identify as assisting the Government in committing crimes against humanity and war crimes generally accompany any natural resource development business or the creation of any industry." Presbyterian Church of Sudan, 453 F. Supp. 2d at 672. None of the acts was inherently criminal or wrongful. "[T]he plaintiffs' theories of substantial assistance serve essentially as proxies for their contention that Talisman should not have made any investment in the Sudan, knowing as it did that the Government was engaged in the forced eviction of non-Muslim Africans from lands that held promise for the discovery of oil." Id. In sum:

> The plaintiffs essentially argue that
> Talisman understood that the Government
> had cleared and would continue to clear
> the land of the local population if oil

companies were willing to come to the Sudan and explore for oil, and that[,] understanding that to be so, Talisman should not have come. They have no evidence that Talisman (or [Greater Nile] or GNPOC) participated in any attack against a plaintiff and no direct evidence of Talisman's illicit intent, so they wish to argue that Talisman's knowledge of the Government's record of human rights violations, and its understanding of how the Government would abuse the presence of Talisman, is a sufficient basis from which to infer Talisman's illicit intent when it designated areas for exploration, upgraded airstrips or paid royalties.

Id. at 672-73.

Plaintiffs argue that the district court's analysis was flawed because it assumed that "ordinary development activities cannot constitute aiding and abetting." This argument misconstrues the district court's analysis, which does not rely on any categorical or blanket principle precluding liability; rather, the court conscientiously looked at each specific activity to determine if it satisfied the aiding and abetting standard. A de novo review of plaintiffs' evidence confirms the soundness of the district court's ruling.

As a threshold matter, Talisman did not manage oil operations in the Sudan: its indirect subsidiary Greater

47

Nile was a 25% shareholder in GNPOC, the corporation responsible for developing the concessions. The rest of the GNPOC shares were held by entities from China, Malaysia, and the Sudan. This attenuation between the plaintiffs' allegations and the named defendant (the only entity over which the district court had personal jurisdiction) raises knotty issues concerning control, imputation, and veil piercing (among other things). Nevertheless, we will assume for most purposes that plaintiffs could surmount these hurdles;[12] so we proceed to the allegations of aiding and abetting and conspiring to commit human rights abuses.

The district court classified four kinds of "substantial assistance" that Talisman provided (or is alleged to have provided) to the Government: "(1) upgrading the Heglig and Unity airstrips; (2) designating areas 'south of the river' in Block 4 for oil exploration; (3) providing financial assistance to the Government through the payment of royalties; [and] (4) giving general logistical support to

---

[12] We will also assume, without deciding, that corporations such as Talisman may be held liable for the violations of customary international law that plaintiffs allege. Because we hold that plaintiffs' claims fail on other grounds, we need not reach, in this action, the question of "whether international law extends the scope of liability" to corporations. Sosa, 542 U.S. at 732 n.20.

48

the Sudanese military."[13] Presbyterian Church of Sudan, 453 F. Supp. 2d at 671-72. We take these up one by one.

1. Talisman helped build all-weather roads and improved airports, notwithstanding awareness that this infrastructure might be used for attacks on civilians. There is no doubt that roads and airports are necessary features of a remote facility for oil extraction: they are used for transporting supplies, bringing workers to the work site, and assuring evacuation in the event of emergency.

There is evidence that Talisman (partially) financed the road-building, from its Calgary headquarters, and helped build other infrastructure, notwithstanding awareness of the Government's activity. But obviously there are benign and constructive purposes for these projects and (more to the point) there is no evidence that any of this was done for an improper purpose. Consistent with plaintiffs' effort to show that GNPOC personnel had knowledge of the Government's

---

[13] The district court also addressed plaintiffs' allegations that Talisman assisted the Government by "using its community development program as a cover for gathering military intelligence" and by publicly denying knowledge of human rights violations. Presbyterian Church of Sudan, 453 F. Supp. 2d at 677. Plaintiffs do not raise the former point on appeal and we agree with the district court that publicly denying knowledge of abuses is not "substantial assistance."

human rights abuses, plaintiffs adduce evidence that senior Talisman officials protested to the Government and that security reports shared with senior Talisman officials expressed concern about the military's use of GNPOC airstrips. Since, however, the proper test of liability is purpose (not knowledge), all this evidence of knowledge (and protest) cuts against Talisman's liability.

Even if Talisman built roads or improved the airstrips with the intention that the military would also be accommodated, GNPOC had a legitimate need to rely on the military for defense. It is undisputed that oil workers in that tumultuous region were subjected to attacks: rebel groups viewed oil installations and oil workers as enemy targets; an e-mail from a Talisman employee describes rebel attacks and the placement of mines in work areas; rebels launched a nighttime mortar attack against a Heglig camp where 700 oil workers were living; and in Block 5A the attacks caused that concessionaire (Lundin Oil AB) to close down operations for an extended period. In these circumstances, evidence that GNPOC was coordinating with the military supports no inference of a purpose to aid atrocities.

2. At one point, Greater Nile was worried that the Government would terminate GNPOC's concession on lands south of its existing operations unless GNPOC began to exploit them, and consideration was given to an expansion. Plaintiffs contend that this consideration violated international law. However, the evidence shows that this expansion south did not occur during the time any Talisman affiliate was in the Sudan, and contemplation does not amount to "substantial assistance" in violation of international law.

3. The royalties paid by GNPOC may have assisted the Government in its abuses, as it may have assisted any other activity the Government wanted to pursue. But there is no evidence that GNPOC or Talisman acted with the purpose that the royalty payments be used for human rights abuses.

4. GNPOC provided fuel for military aircraft taking off on bombing missions, and some of the fuel was paid for by GNPOC rather than the Government. This evidence is insufficient to defeat summary judgment for two reasons. First, there is no showing that Talisman was involved in such routine day-to-day GNPOC operations as refueling aircraft. Second, there is no evidence that GNPOC workers

provided fuel for the purpose of facilitating attacks on civilians; to the contrary, an e-mail from a Talisman employee to his supervisor, which plaintiffs use to show that the military refueled at a GNPOC airstrip, expresses anger and frustration at the military using the fuel.

Plaintiffs' primary argument is that Talisman supported the creation of a buffer zone around its oil fields, understanding that the Government was displacing huge numbers of civilians from oil-rich regions, decimating as it went the population of southern Sudan. As evidence, plaintiffs cite statements in Greater Nile security memoranda, including this one: "[t]he military strategy, driven it appears by the GNPOC security management, is to create a buffer zone, i.e., an area surrounding both Heglig and Unity camps inside which no local settlements or commerce is allowed."[14]

Plaintiffs repeatedly cite the forced displacement of people from the oil fields, but they do not allege that such displacement in itself is a violation of international law.

---

[14] Talisman argues that this statement (and others cited by plaintiffs) references an area of 5km and 8km around the Heglig and Unity camps, respectively, not a zone covering the entirety of the concession area.

That is understandable, because a government has power to regulate use of land and resources. Resource extraction in particular is by nature land-intensive: land is needed for exploration and engineering, equipment, rigs or mines, offices and dormitories in remote areas, transportation infrastructure, and so on. Under the best circumstances, these facilities might require relocation from a development area. But GNPOC was not operating in the best of circumstances. Sudan's oil was located in an area heavily contested in a civil war, in a region of the country that had suffered through four decades of violence before Talisman arrived. The oil facilities came under frequent rebel attack and oil workers were killed during the relevant time. Safe operation of the oil facilities therefore required tightened security; and displacing civilians from an "area within the security ring road" was not in itself unlawful.

It is therefore not enough for plaintiffs to establish Talisman's complicity in depopulating areas in or around the Heglig and Unity camps: plaintiffs must establish that Talisman acted with the purpose to assist the Government's violations of customary international law.

Plaintiffs have provided evidence that the Government violated customary international law; but they provide no evidence that Talisman acted with the purpose to support the Government's offenses. Plaintiffs do not suggest in their briefs that Talisman was a partisan in regional, religious, or ethnic hostilities, or that Talisman acted with the purpose to assist persecution. To the contrary, the actions of the Sudanese government threatened the security of the company's operations, tarnished its reputation, angered its employees and management, and ultimately forced Talisman to abandon the venture.

Plaintiffs argue that they need no direct evidence of purpose because "'[genocidal intent may] be inferred from a number of facts and circumstances, such as the general context, the perpetration of other culpable acts systematically directed against the same group, the scale of atrocities committed, the systematic targeting of victims on account of their membership of a particular group, or the repetition of destructive and discriminatory acts.'" Presbyterian Church of Sudan v. Talisman Energy, Inc., 226 F.R.D. 456, 479 (S.D.N.Y. 2005)(alterations in original)(quoting Prosecutor v. Jelisec, No. IT-95-10-A,

Appeals Chamber Judgment, ¶ 101 (July 5, 2001)). True, intent must often be demonstrated by the circumstances, and there may well be an ATS case in which a genuine issue of fact as to a defendant's intent to aid and abet the principal could be inferred; but in this case, there were insufficient facts or circumstances suggesting that Talisman acted with the purpose to advance violations of international humanitarian law.

The reports that plaintiffs rely upon to prove knowledge also show that Greater Nile security personnel and GNPOC workers were upset by the Government's actions and possible attacks on civilians. For example, several reports address the company's efforts to relieve the plight of internally displaced persons, which included stockpiling tons of relief supplies and distributing food, water, medicine, and mosquito nets.

There is evidence that southern Sudanese were subjected to attacks by the Government, that those attacks facilitated the oil enterprise, and that the Government's stream of oil revenue enhanced the military capabilities used to persecute its enemies. But if ATS liability could be established by knowledge of those abuses coupled only with such commercial

55

activities as resource development, the statute would act as a vehicle for private parties to impose embargos or international sanctions through civil actions in United States courts.  Such measures are not the province of private parties but are, instead, properly reserved to governments and multinational organizations.

**VI**

Plaintiffs argue that the district court failed to consider portions of the summary judgment record and failed to afford the parties an opportunity to argue evidentiary issues.  We reject these contentions.  The district court did not make a "wholesale blanket ruling" excluding plaintiffs' evidence and did not exclude evidence in contravention of the Federal Rules of Evidence.  Moreover, plaintiffs have cited no relevant authority holding that a district court is confined to a particular evidentiary procedure in ruling on a summary judgment motion.

A district court deciding a summary judgment motion "has broad discretion in choosing whether to admit evidence."  Raskin v. Wyatt Co., 125 F.3d 55, 65 (2d Cir. 1997). "The principles governing admissibility of evidence

56

do not change on a motion for summary judgment." Id. at 65-66. "Rule 56(e) provides that affidavits in support of and against summary judgment shall set forth such facts as would be admissible in evidence. Therefore, only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment." Id. at 66 (internal quotation marks and citations omitted). It is difficult to see how a court can decide a summary judgment motion without deciding questions of evidence:

> Because the purpose of summary judgment
> is to weed out cases in which "there is
> no genuine issue as to any material fact
> and . . . the moving party is entitled to
> a judgment as a matter of law," it is
> appropriate for district courts to decide
> questions regarding the admissibility of
> evidence on summary judgment. Although
> disputes as to the validity of the
> underlying data go to the weight of the
> evidence, and are for the fact-finder to
> resolve, questions of admissibility are
> properly resolved by the court. The
> resolution of evidentiary questions on
> summary judgment conserves the resources
> of the parties, the court, and the jury.

Id. (citations omitted)(alterations in original); see also LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp., 424 F.3d 195, 205-06 (2d Cir. 2005)("Even on summary judgment, a district court has wide discretion in determining which evidence is admissible, [and] we review its evidentiary

rulings for manifest error." (internal quotation marks and citations omitted))(alterations in original)).

At the outset of the summary judgment opinion in this case, the district court observed that

> plaintiffs have not distinguished between the admissible and inadmissible. The plaintiffs repeatedly describe 'Talisman' as having done this or that, when the examination of the sources to which they refer reveals that it is some other entity or an employee of some other company that acted. They assert that this or that event happened, when the documents to which they refer consist of hearsay embedded in more hearsay. Indeed, most of the admissible evidence is either statements made by or to Talisman executives, and the plaintiffs' descriptions of their own injuries, with very little admissible evidence offered to build the links in the chain of causation between the defendant and those injuries.

Presbyterian Church of Sudan, 453 F. Supp. 2d at 639.

Plaintiffs argue that this prefatory language amounts to an evidentiary ruling and bespeaks a disregard of the plaintiffs' evidence in whole. However, the district court set aside its concerns about the evidence in describing the facts of the case: "In order to describe as fairly as possible the evidence the plaintiffs present, the description of events that follows is largely taken from the

documents on which the plaintiffs have placed the greatest reliance, without a careful analysis of the admissibility of this evidence." Id. at 641-42.

In weighing evidence of questionable admissibility, the district court often noted Talisman's evidentiary objection, and sometimes expressed a view of the objection; but the court never made a blanket exclusion of evidence.

Plaintiffs focus on four specific "exclusions":

1. Congressional findings included in the Sudan Peace Act stating that genocide was taking place in the Sudan and that oil profits were contributing to the misery. See Pub. L. No. 107-245, 116 Stat. 1504 (codified at 50 U.S.C. § 1701). This was not excluded; the court described the congressional findings and Talisman's objections, and explained that in any case plaintiffs had no proof of Talisman's intent. Presbyterian Church of Sudan, 453 F. Supp. 2d at 669-70.

2. Evidence from plaintiffs' experts about the relationship between oil profits and military spending. The district court conceded that "plaintiffs have evidence from which a jury could find that Talisman believed that the Government used oil revenues to buy armaments, even if

59

Talisman did not have any direct evidence or knowledge of that fact." Id. at 676. The district court nonetheless concluded that was not enough, because plaintiffs had not "identified evidence sufficient to support a finding that when Talisman (or [Greater Nile] or GNPOC) paid royalties, it 'specifically directed' those payments to the Government's procurement of weaponry to target civilians and displace them." Id.

3. Security reports by Greater Nile personnel (who monitored threats to GNPOC workers) recording the military's use of airstrips to conduct bombing runs and other military operations. The district court described these reports in great detail in the background section of its opinion, and explained that the reports painted a complex picture of the situation. Whatever the significance of the information in the reports, there is no question that they were accounted for in the district court's analysis.

4. A declaration from the head of security for Arakis (Robert Norton), stating that he had warned Talisman at the time it purchased Arakis about likely civilian displacement. The district court excluded this declaration because the witness had testified at an earlier deposition that he was

unaware of any displacement. Presbyterian Church of Sudan, 453 F. Supp. 2d at 647 & n.11. The district court explained "[a] witness may not use a later affidavit to contradict deposition testimony in an effort to defeat a motion for summary judgment." Presbyterian Church of Sudan, 453 F. Supp. 2d at 647 (citing Bickerstaff v. Vassar Coll., 196 F.3d 435, 455 (2d Cir. 1999)). Plaintiffs contend that only declarations from parties contradicting earlier deposition testimony are inadmissible, and that Norton's declaration did not fit within this rule. We need not decide this question, because [i] there was other evidence of Talisman's knowledge of displacement of civilians and [ii] Talisman's notice of this displacement is not enough to show an illicit purpose.

Plaintiffs cite United States v. McDermott, 245 F.3d 133 (2d Cir. 2001), and United States v. Carson, 52 F.3d 1173 (2d Cir. 1995), for the proposition that a party must make a specific and contemporaneous objection to the admission of trial evidence under Federal Rule of Evidence 103(a)(1). This non-controversial proposition is irrelevant, because the case never went to trial and because Talisman is not objecting to the district court's admission

61

of trial evidence.

Finally, plaintiffs rely on an unpublished opinion from the Eleventh Circuit which reversed a district court's striking of fifty passages from a response to a motion for summary judgment.  Mack v. ST Mobile Aerospace Eng'g, Inc., 195 F. App'x 829 (11th Cir. 2006).  The district court in that case: [i] failed to give the parties an opportunity to argue the merits of the objections; [ii] failed to analyze and rule on each objection; and [iii] offered only a "blanket declaration that 'the statements at issue are inadmissible hearsay, double hearsay, opinion, speculation and/or conjecture.'"  Id. at 842-43.  Moreover, nothing in the submission could be "inadmissible hearsay evidence because the passages [were] not evidence at all--they [were] the plaintiffs' arguments in their responsive pleading."  Id. at 842 (emphasis in original).  Mack is easily distinguishable.  First, the district court in this case explained its reasons for excluding evidence.  Second, the district court in Mack struck pleadings, not evidence.  Third, the Eleventh Circuit reversed in part because it determined (after addressing several specific strikes) that the district court's evidentiary rulings were wrong on the

62

merits. Plaintiffs have pointed to no incorrect rulings in this case (with the possible exception of the Norton declaration, which is not material as to purpose).[15]

In conclusion, there is no evidence that the district court improperly failed to consider plaintiffs' evidence.

**VII**

Two weeks before Talisman moved for summary judgment, plaintiffs filed a Proposed Third Amended Class Action Complaint. In denying plaintiffs' motion to amend, the district court explained that the Second Amended Complaint sought to hold Talisman liable for its own acts, while the proposed pleading, "[w]hen stripped to its essentials, . . . seeks to hold Talisman liable for the actions of GNPOC." Presbyterian Church of Sudan, 453 F. Supp. 2d at 679. Thus, while the Second Amended Complaint alleged that Talisman aided and abetted the Government, the Third Amended Complaint alleged that Talisman aided and abetted GNPOC and

---

[15] Plaintiffs also rely on Halbrook v. Reichhold Chemicals, Inc., 735 F. Supp. 121, 128 (S.D.N.Y. 1990), in which the district court denied summary judgment on a sexual harassment claim. Halbrook is inapposite because the court in that case deferred ruling on trial evidence given its denial of summary judgment. The court did not articulate a general rule for considering evidence on summary judgment.

Greater Nile. Id.

The district court ruled that, to plead new theories of liability three years after the deadline for amendment specified in the scheduling order, plaintiffs were required to show good cause for delay and the exercise of due diligence. Id. at 680 (citing Fed. R. Civ. P. 16; Grochowski v. Phoenix Constr., 318 F.3d 80, 86 (2d Cir. 2003); In re Wireless Tel. Servs. Antitrust Litig., 02 Civ. 2673(DLC), 2004 WL 2244502, at *5 (S.D.N.Y. Oct. 6, 2004)). The court found that plaintiffs failed to show good cause, and that "[i]t could even be said that the plaintiffs acted in bad faith in waiting until the eve of summary judgment practice to file the motion to amend." Id. at 680.

Once the deadline for amendment in a scheduling order has passed, leave to amend may be denied "where the moving party has failed to establish good cause." Parker v. Columbia Pictures Indus., 204 F.3d 326, 340 (2d Cir. 2000). "[A] finding of 'good cause' depends on the diligence of the moving party." Id. We review a district court's denial of leave to amend for abuse of discretion.

Plaintiffs argue that they filed the Third Amended Complaint as promptly as they could at the conclusion of

64

discovery. But the district court concluded that it was unreasonable for plaintiffs to hold the proposed amendment until discovery ended. Plaintiffs also argue that the proposed amendment would not have required new discovery and that the dates in the scheduling order were irrelevant because the theories pled in the Third Amended Complaint were already in the case. However, the Second Amended Complaint reads as if Talisman operated directly in the Sudan with no intervening subsidiaries and it does not allege that Talisman acted through GNPOC. While references to GNPOC are sprinkled throughout the Second Amended Complaint, the gravamen is that Talisman conspired directly with the Sudanese government. Thus, the Third Amended Complaint, which alleged that Talisman aided and abetted GNPOC and that it conspired with Greater Nile, substantially revised plaintiffs' theory.

It is true that the issue of joint venture liability was mentioned early in the case by Judge Schwartz in a 2003 decision denying Talisman's motion to dismiss on the ground that GNPOC was a necessary party. In that decision, the district court considered and rejected a number of arguments as to why the litigation could not proceed without GNPOC.

65

Judge Schwartz explained that "nearly every paragraph describes alleged unlawful acts by Talisman, not GNPOC." Presbyterian Church of Sudan, 244 F. Supp. 2d at 352. In a footnote, the district court added that "[t]o the extent that the Amended Complaint alleges acts by GNPOC, . . . Talisman may potentially be held liable for the acts of other GNPOC members under a theory of joint venture liability." Id. at 352 n.50 (citation omitted)

Plaintiffs cite this footnote as evidence that the district court and Talisman were aware from early in the litigation that plaintiffs might proceed against Greater Nile and GNPOC on theories of joint liability. But Judge Cote observed that the Third Amended Complaint "dramatically alter[ed] the plaintiffs' theories of liability and the focus of the entire case," Presbyterian Church of Sudan, 453 F. Supp. 2d at 680, and Talisman vigorously contests the idea that the substance of the amended complaint was already understood to be part of the case. The district court supervised this case for three years before the filing of plaintiffs' motion and was thoroughly familiar with the facts and allegations, having written several lengthy opinions in the matter. We owe deference to the district

66

court's analysis.

The district court also denied leave to amend on the alternative ground that amendment would be futile. The court assessed whether plaintiffs could pierce the corporate veils of GNPOC and subsidiaries between GNPOC and Talisman: the court held plaintiffs could not pierce and that Talisman could not be liable on theories of joint venture or agency. Id. at 683-89.

We have not considered what law would be applied in seeking to pierce a corporate veil in the ATS context, and this case does not require us to reach the question. The district court discussed the issue in an abundance of caution; but we have no occasion to do so given our affirming the denial of leave to amend on good-faith grounds.

Finally, plaintiffs argue that even absent amended pleading, the district court should have considered their agency, joint venture, and veil piercing theories. We disagree. The district court concluded that these theories were insufficiently pled, and our independent review of the Second Amended Complaint supports the district court's

conclusion.[16]

## CONCLUSION

For the foregoing reasons, the judgment of the district court is affirmed.

---

[16] Plaintiffs also appeal from the denial of their motions for class certification. Because we affirm the district court's grant of summary judgment as to all claims against Talisman, we do not reach that issue.