**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 22-1678**

---

ESTATE OF ARTURO GIRON ALVAREZ, by and through Maria Ana Giron Galindo as Administrator; THE 773 INDIVIDUALS IDENTIFIED ON EXHIBIT 1 TO THE COMPLAINT; UNKNOWN USE PLAINTIFFS,

Plaintiffs – Appellants,

v.

THE ROCKEFELLER FOUNDATION,

Defendant – Appellee.

---

Appeal from the United States District Court for the District of Maryland, at Baltimore. Theodore D. Chuang, District Judge. (1:15-cv-00950-TDC)

---

Argued: December 7, 2023                    Decided: March 20, 2024

---

Before WILKINSON and HEYTENS, Circuit Judges, and Henry E. HUDSON, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.

---

Affirmed by published opinion. Judge Hudson wrote the opinion, in which Judge Wilkinson and Judge Heytens joined. Judge Wilkinson wrote a concurring opinion.

---

**ARGUED:** Paul David Bekman, BEKMAN, MARDER, HOPPER, MALARKEY & PERLIN, L.L.C., Baltimore, Maryland; Floyd Ronald Jenkins, MERIDIAN 361 INTERNATIONAL LAW GROUP PLLC, Portland, Maine, for Appellants. Michael Hugh McGinley, DECHERT LLP, Philadelphia, Pennsylvania, for Appellee. **ON BRIEF:** Sheila L. Birnbaum, Danielle A. Gentin Stock, DECHERT LLP, New York, New York;

Robert P. LoBue, David S. Kleban, PATTERSON BELKNAP WEBB & TYLER LLP, New York, New York; Jim Frederick, FAEGRE DRINKER, Washington, D.C., for Appellee.

———————————

HUDSON, District Judge:

This matter is before the Court on serious deprivations and violations of human rights. A class of 842 plaintiffs brought claims under the Alien Tort Statute ("ATS") and the Guatemalan Civil Code against Johns Hopkins, The Rockefeller Foundation ("TRF"), and Bristol-Myers Squibb Company ("Bristol-Myers"), alleging that the defendants were involved in facilitating nonconsensual human medical experiments regarding sexually transmitted diseases ("STDs") in Guatemala from 1946 to 1948 (the "Guatemala Experiments" or "Experiments"). The defendants filed a motion for summary judgment, and the district court granted the motion. The plaintiffs filed this appeal, only challenging the district court's order granting summary judgment in relation to the defendant, TRF. For the following reasons, we affirm.

I

In reviewing the district court's grant of summary judgment, we view the facts in the light most favorable to Appellants. *Estate of Jones v. City of Martinsburg*, 961 F.3d 661, 664 (4th Cir. 2020). This appeal concerns 842 victims[1] (collectively, "Appellants") of

---

[1] The 842 plaintiffs are comprised of six categories: (1) individuals who were unknowingly infected with syphilis and did not consent to being infected (collectively, "Direct Plaintiffs"); (2) spouses or sexual partners of Direct Plaintiffs subjected to secondary exposure to syphilis; (3) children of Direct Plaintiffs subjected to secondary exposure to syphilis passed in utero or at birth; (4) grandchildren of Direct Plaintiffs subjected to secondary exposure to syphilis across two generations; (5) parents, spouses, or children of individuals who died as a result of syphilis acquired from the Guatemala Experiments; and (6) the estates and designated beneficiaries of those who died as a result of syphilis.

the Guatemala Experiments—a horrific set of unethical and inhumane experiments conducted on human test subjects in Guatemala to study STDs.

In the 1940s, the United States grew concerned with the heightened outbreaks of STDs—particularly, gonorrhea and syphilis. Thus, Dr. Juan Funes ("Dr. Funes"), a Guatemalan physician who previously conducted STD experiments, proposed a research project in Guatemala to study methods of prophylaxis[2] for syphilis. Because commercial sex work was legal in Guatemala, Dr. Funes' proposed identifying inmate volunteers at a Guatemalan prison, exposing them to STDs through sexual intercourse with infected sex workers, and then testing the effectiveness of a specific prophylaxis on the inmate volunteers. This proposal created the infamous Guatemala Experiments.

In 1946, Dr. Thomas Parran ("Dr. Parran"), the Surgeon General of the United States Public Health Service (the "PHS"),[3] approved Dr. Funes' proposal and recommended the project to the National Advisory Health Council (the "NAHC") for funding. The NAHC recommended funding the proposal, and the grant was ultimately approved, including $110,450 to be provided to the Pan-American Sanitary Bureau ("PASB") for venereal disease studies in Guatemala. The Venereal Disease Research Laboratory ("VDRL"), a subsect of the PHS, directly funded the Guatemala Experiments.

---

[2] Prophylaxis is a method to prevent the spread of syphilis.

[3] Dr. Parran simultaneously served as a member of TRF's Board of Trustees and of the Board of Scientific Directors of TRF's International Health Division ("IHD").

4

After completion of the laboratory in Guatemala, serology testing[4] began at the prison in November 1946. In February 1947, Dr. John C. Cutler ("Dr. Cutler"), a junior PHS officer, and his research team began infecting test subjects with STDs as part of the study. The researchers infected prisoners by arranging sexual intercourse between the volunteer prisoners and commercial sex workers (referred to as "normal exposure"), or by injecting or directly applying the STD to the test subject. There are no records indicating that the sex workers were compensated. From May 1947 to October 1948, the researchers conducted thirty-two (32) experiments using gonorrhea, seventeen (17) using syphilis, and one (1) using chancroid, which, collectively, involved a total of 1,308 people, ranging from ten (10) to seventy-two (72) years old.

The method of normal exposure proved to be ineffective in transferring syphilis and its symptoms of infection to the prisoners. This ineffectiveness led researchers to directly inject syphilitic materials into the prisoner test subjects. From May 1947 to September 1948, 219 prisoners were exposed to syphilis either by sex workers or direct injection, and only ninety-two (92) received some form of treatment. There is no contemporaneous record of the prisoners consenting to their participation in the Guatemala Experiments. Nor are there records indicating that the prisons knew or understood that the Guatemala Experiments were ongoing.

---

[4] Serology testing is a procedure that tests blood for the presence of syphilis antibodies in order to reliably diagnose active or previous syphilitic infection.

Because of the obstacles the researchers faced at the prison, Dr. Cutler recommended conducting experiments on patients at the Guatemalan psychiatric hospital. These experiments occurred from May 1947 to October 1948. Patients were exposed to syphilis by injection or direct application of a cotton ball moistened with syphilitic material. When these methods proved ineffective, Dr. Cutler began infecting patients through scarification and abrasions on their genitals—a gruesome and drastic tactic of infection. Patients were also infected by oral ingestion of syphilitic material and through cisternal punctures, where syphilis was directly injected into their spinal fluid from the back of the skull.

The psychiatric test patients were not paid for their participation in these experiments. Instead, Dr. Cutler gave them cigarettes and purchased items for the benefit of the psychiatric hospital. Like with the prisoner test subjects, there is no evidence that the psychiatric patients consented to the experiments, nor is there evidence that they knew or understood that the Guatemala Experiments were ongoing. However, there is evidence that patients actively objected to the experiments.

Dr. Cutler and his team also conducted experiments to research gonorrhea, which ran concurrently with the syphilis experiments. In these experiments, members of the Guatemalan Army were exposed to gonorrhea through sexual intercourse with commercial sex workers. Similarly, there is no evidence that the soldiers consented or were compensated for their participation.

After experiencing issues recruiting sex workers who were willing to participate in the gonorrhea experiments, the researchers began directly infecting sex workers with

6

gonorrhea by applying a cotton swab moistened with gonorrhea to the cervix. Again, there is no evidence that the sex workers consented, nor is there evidence that they were aware they were being infected with gonorrhea. When these methods proved ineffective, the researchers began directly injecting gonorrhea into the sex workers and psychiatric patients through inoculation in the rectum, urethra, or eyes.

Throughout these experiments, Dr. Cutler and his research team continued to engage in serology testing. This testing involved blood tests and lumbar punctures to evaluate whether the human test subjects had active or previous infections from STDs. The serology testing originally occurred only on the Guatemalan prisoners, soldiers, and psychiatric patients. However, it was later administered on patients at the Venereal Disease and Sexual Prophylaxis Hospital, patients at a leprosy facility, and children.[5]

The Guatemala Experiments' funding ran through June 1948, but serology testing continued until at least 1949, and the observation and study of human test subjects at the psychiatric hospital continued until at least 1953.

## II

TRF is a foundation involved in national and international research in public health and, during the mid-1900s, had a particular interest in discovering a cure for syphilis. The IHD was TRF's sole operating division, and was led by a Director and Associate Directors, who served as officers of TRF. The IHD assigned its personnel to "work through official

---

[5] The serology testing on children occurred from approximately June 1947 to the summer of 1949. The researchers conducted testing on 1,384 children between the ages of one (1) and eighteen (18).

government agencies." J.A. 821. The Director of the IHD, Dr. George Strode ("Dr. Strode"), assigned Dr. Frederick Soper ("Dr. Soper"), an Associate Director of TRF, to the PASB in February 1947, coinciding with the Guatemala Experiments. Dr. Strode informed Dr. Soper that this was a "change of assignment." J.A. 1014. However, Dr. Soper believed that he was no longer a part of TRF. *See* J.A. 2542 (After assuming his position with the PASB, Dr. Soper wrote that he "ha[d] three organizations to serve, the World Health Organization, the Pan American Sanitary Bureau[,] and the Pan American Union."); J.A. 1009 (Dr. Soper indicated that he "was no longer with the Foundation, but with the Pan American Health Organization . . . .").

While assigned to the PASB, Dr. Soper remained an Associate Director of IHD, and TRF continued to pay his salary and benefits until January 1, 1948. At this time, the PASB was financially unstable, and functioned with a limited budget and operational funds. Notably, the PASB's constitution, approved in January 1947 and formally adopted in October 1947, prohibited Dr. Soper, and all PASB personnel, from "seek[ing] []or receiv[ing] instructions from any government or from any authority external to the Pan American Sanitary Organization." J.A. 1930.

While Dr. Soper served the PASB, the NAHC re-authorized funding for the Guatemala Experiments. This funding was designated for the PASB, where Dr. Soper served as the "Investigator" for the Experiments. J.A. 1307. As Investigator, Dr. Soper kept a journal detailing the Guatemala Experiments—including his accounts of the artificial inoculation of syphilis and gonorrhea in human test subjects and the results of the serology testing.

8

## III

Prior to the case at hand, a class of victims of the Guatemala Experiments, and their heirs, filed suit in the United States District Court for the District of Columbia against the Secretary of Health and Human Services, the Surgeon General of the PHS, the Director of the Pan-American Health Organization,[6] and other federal officials. The class action sought to hold the defendants liable for the Guatemala Experiments under the ATS and the United States Constitution. *See Garcia v. Sebelius*, 867 F. Supp. 2d 125, 130–31 (D.D.C. 2012), *vacated in part*, 919 F. Supp. 2d 43 (D.D.C. 2013). The district court ultimately dismissed the case, concluding that the United States had not waived sovereign immunity for the tort claims, the plaintiffs failed to allege the requisite personal involvement necessary to maintain the constitutional claims, and the Pan-American Health Organization was entitled to immunity under the International Organizations Immunities Act of 1945. *Id.* at 137–38, 144.

Appellants filed the present lawsuit in the United States District Court for the District of Maryland on April 1, 2015. They asserted claims under the ATS and the Guatemalan Civil Code against Johns Hopkins, TRF, and Bristol-Myers, alleging that "physicians, researchers, and other employees and agents" of the defendants "designed, developed, approved, encouraged, directed, oversaw, and aided and abetted nonconsensual, nontherapeutic, human subject experiments in Guatemala . . . ." J.A. 55. Bristol-Myers was subsequently voluntarily dismissed as a defendant.

---

[6] The Pan-American Health Organization is the successor organization to the PASB.

In 2017, the district court dismissed all claims under the Guatemalan Civil Code. The court also dismissed the ATS claims based on direct liability, except for a limited claim against TRF. However, the court declined to dismiss plaintiffs' ATS claims based on aiding and abetting and conspiracy liability.

As to the remaining claims, the operative complaint alleged that a group of researchers at Johns Hopkins and TRF, who spent their careers studying syphilis, "intentionally chose to conduct nontherapeutic, nonconsensual experiments because doing so allowed them to quickly identify a large pool of uninfected people, infect them with syphilis strains, . . . and then use the newly infected men and women as a resource to be consumed as a means to their ends" of advancing their research interests. J.A. 56. Additionally, they alleged that TRF "actively participated in, joined and participated in a conspiracy to further, and aided and abetted the Guatemala Experiments" through essential personnel, namely, Dr. Parran and Dr. Soper. J.A. 127.

The parties filed cross-motions for summary judgment on these claims. The district court granted TRF's motion on the ground that Dr. Parran and Dr. Soper were not acting as agents of TRF, and, therefore, TRF is not liable as a principal under the ATS. Appellants now appeal to this Court the district court's grant of TRF's motion for summary judgment as it relates to Dr. Soper.

IV

On appeal, Appellants argue that the district court erred when it granted TRF summary judgment. "We review de novo a district court's decision to grant summary judgment, applying the same legal standards as the district court and viewing all facts and

10

reasonable inferences in the light most favorable to the nonmoving party." *Ballengee v. CBS Broad., Inc.*, 968 F.3d 344, 349 (4th Cir. 2020). Summary judgment is proper only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P 56(a). To create a genuine issue of material fact, the nonmoving party must offer "'sufficient proof in the form of admissible evidence' instead of 'relying solely on the allegations of her pleadings.'" *Webster v. Chesterfield Cnty. Sch. Bd.*, 38 F.4th 404, 410 (4th Cir. 2022) (quoting *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016)). However, "the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Humphreys & Partners Architects v. Lessard Design, Inc.*, 790 F.3d 532, 540 (4th Cir. 2015) (quoting *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013)) (internal quotation marks omitted). "[T]he relevant inquiry is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Gordon v. Schilling*, 937 F.3d 348, 356 (4th Cir. 2019) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)).

To establish aiding and abetting liability in an ATS claim, Appellants must show that a defendant "(1) provide[d] practical assistance to the principal which has a substantial effect on the perpetration of the crime, and (2) [did] so with the purpose of facilitating the commission of that crime." *Aziz v. Alcolac, Inc.*, 658 F.3d 388, 396 (4th Cir. 2011) (quoting *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 258 (2d Cir. 2009)) (internal quotations omitted). Additionally, this Court has held that "for liability to attach

11

under the ATS for aiding and abetting a violation of international law, a defendant must provide substantial assistance with the purpose of facilitating the alleged violation." *Id.* at 401. Knowledge alone is not enough to establish liability. *Id.* ("[N]o . . . consensus exists for imposing liability on [those] who *knowingly* (but not purposefully) aid and abet a violation of international law." (quoting *Talisman*, 582 F.3d at 259) (internal quotations omitted) (modifications in original)).

"Under traditional agency law, an agency relationship exists when a principal 'manifests assent' to an agent 'that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act.'" *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 659–60 (4th Cir. 2019) (quoting RESTATEMENT (THIRD) OF AGENCY § 1.01 (AM. L. INST. 2006)). "Agencies . . . come in many sizes and shapes: One may be an agent for some business purposes and not others so that the fact that one may be an agent for one purpose does not make him or her an agent for every purpose." *Daimler AG v. Bauman*, 571 U.S. 117, 135 (2014) (internal quotations and citation omitted).

A principal is only liable for an agent's tortious acts if the acts were performed within the scope of employment, which is conduct "of the same general nature as that authorized, or incidental to the conduct authorized." RESTATEMENT (SECOND) OF AGENCY §§ 219, 229 (AM. L. INST. 1957). It is possible for an individual to be the agent of two principals at the same time. *See N.L.R.B. v. Town & Country Elec., Inc.*, 516 U.S. 85, 94–95 (1995) ("[A] person may be the servant of two masters . . . at one time as to one act, if the service to one does not involve abandonment of the service to the other." (quoting

12

RESTATEMENT (SECOND) OF AGENCY § 226 (AM. LAW. INST. 1957)) (emphasis omitted)). This can occur when an agent is "lent," *i.e.*, where he is "in the general service of [a principal], and, nevertheless, with respect to particular work, may be transferred, with his own consent or acquiescence, to the service of a third person, so that he becomes the servant of that person, with all the legal consequences of the new relation." *Standard Oil Co. v. Anderson*, 212 U.S. 215, 220 (1909); *see also Ladd v. Rsch. Triangle Inst.*, 335 F. App'x 285, 288 (4th Cir. 2009) ("A person can be in the general employ of one company while at the same time being in the particular employ of another . . . .").

When determining whether such a transfer has occurred, "we must inquire whose is the work being performed;" this question "is usually answered by ascertaining who has the power to control and direct the servants in the performance of their work." *Standard Oil*, 212 U.S. at 221–22; *see also* RESTATEMENT (SECOND) OF AGENCY § 227 cmt. a (AM. LAW INST. 1957) ("[T]he important question is not whether or not [the agent] remains the servant of the general employer as to matters generally, but whether or not, as to the act in question, he is acting in the business of and under the direction of one or the other."). When an agent has been lent by one principal to the service of another, the agent, "in respect of his acts in that service, is to be dealt with as the servant of the latter and not of the former." *Denton v. Yazoo & M.V.R. Co.*, 284 U.S. 305, 308 (1932).

## V

In applying the aforementioned standards, this Court finds that the district court did not err in granting summary judgment to TRF. Appellants argue that the evidence

13

demonstrates Dr. Soper was an agent of TRF while at the PASB.[7] Appellants emphasize the fact that TRF paid Dr. Soper's salary and benefits in 1947 after he became the Director of the PASB. However, the payment of wages alone is insufficient to establish an agency relationship. *Standard Oil*, 212 U.S. at 225 (stating that, though payment of wages is a factor to be considered, it is not one of the "ultimate facts" and is only "more or less useful in determining" which employer's work is being done and which employer exercised "the power of control"). Here, there is no indication that TRF was directing or controlling Dr. Soper's work at the PASB. In fact, the evidence demonstrates that TRF agreed to pay Dr. Soper's salary because the PASB was experiencing financial difficulties. Once the PASB raised enough money to fund the director position, it began paying Dr. Soper directly.

Appellants further argue that Dr. Soper was doing the work of TRF while at the PASB because he was furthering TRF's goal of finding a cure for syphilis. Appellants state that, because Dr. Soper remained an officer of TRF during 1947, he was not truly on leave from TRF. This argument is unconvincing. Though Dr. Soper remained an officer of TRF, he did not communicate with TRF on a regular basis, nor is there evidence that he took

---

[7] In their brief, Appellants cite to multiple items of evidence that were not in the record considered by the district court. *See Carlson v. Bos. Sci. Corp.*, 856 F.3d 320, 324 (4th Cir. 2017) ("The Federal Rules of Civil Procedure require parties to cite all evidence in support of their positions at summary judgment, thus permitting a district court to limit its review to such cited materials." (citing FED. R. CIV. P. 56(c)(1), (3))). Accordingly, the Court will not consider evidence cited by Appellants that was not properly before the district court.

direction from TRF while Director of the PASB.[8] Dr. Soper stated himself that he "was no longer with the Foundation." J.A. 1009. The connection between TRF's interest in finding a cure for syphilis and the work that Dr. Soper did while at the PASB is simply far too attenuated to establish an agency relationship.

Finally, there is insufficient evidence to support Appellants' argument that Dr. Soper was a dual agent of TRF and the PASB because, though TRF did not exercise control over him, it maintained the ability to do so. As previously stated, there is no indication that TRF had the ability to exercise control over Dr. Soper while at the PASB. Though TRF paid his salary, Dr. Soper appeared at all times to be doing the work of the PASB. Finally, the PASB's constitution, the general terms of which were adopted by the PASB in January 1947, prohibited Dr. Soper from taking outside direction.

The Court sympathizes with the victims of the Guatemala Experiments who suffered inhumane and unacceptable treatment at the hands of Dr. Soper and others. However, TRF's connection to the Experiments is too tenuous to be held liable for them. Because the Court finds that Dr. Soper was not an agent of TRF, it need not reach TRF's alternative arguments.

For the foregoing reasons, we hereby affirm the district court's grant of summary judgment in favor of TRF.

*AFFIRMED*

---

[8] During oral argument, Appellants emphasized the fact that Dr. Soper was required to send monthly reports to TRF while at the PASB. However, because these reports were not properly raised before the district court, this Court will not consider them.

WILKINSON, Circuit Judge, concurring:

The U.S. Army had its first glimpse into the Nazi regime's horrors when it liberated the Ohrdruf concentration camp on April 4, 1945. *See* U.S. Holocaust Memorial Museum, *The 89th Infantry Division During World War II* (last accessed Jan. 9, 2024). The scale of the inhumanity evident in the liberating soldiers' reports compelled General Eisenhower to visit. *See id.* As he walked through the captured Nazi camp, flanked by Generals Bradley and Patton, Eisenhower witnessed charred human remains strewn across a burning pyre and the bodies of emaciated victims killed by starvation piled high in a wooden shed. *See id.* Eisenhower made it plain that the whole world needed to understand the "brutality and ruthless disregard of every shred of decency" displayed by the Nazis at Ohrdruf. DWIGHT D. EISENHOWER, CRUSADE IN EUROPE 408–09 (1948). He immediately requested that the United States and United Kingdom send journalists and legislators to the camp so there would be "no room for cynical doubt" as to its horrors. *Id.* at 409; *see also* U.S. Holocaust Memorial Museum, *Eisenhower Asks Congress and Press to Witness Nazi Horrors* (last accessed Jan. 9, 2024).

Ohrdruf was just the tip of the iceberg in Nazi Germany's eugenic campaign to exterminate the Jewish people and other individuals the campaign's malignant architects classified as inferior. When the U.S. Army liberated larger concentration camps like Buchenwald and Dachau, it confronted even more shocking atrocities. Among the horrors was evidence of large-scale human experimentation conducted without, to put it mildly, any consent. At Dachau alone, Nazi scientists intentionally infected prisoners with malaria, forced other prisoners into a low-pressure chamber to watch them die of simulated altitude

16

sickness, and froze yet others alive to study hypothermia. *See* Peter Tyson, *Holocaust on Trial: The Experiments*, PBS NOVA ONLINE (Oct. 2000); U.S. Holocaust Memorial Museum, *Dachau* (last accessed Jan. 9, 2024). The camps liberated by the Soviet Army contained equal horrors, including arbitrary amputations at Ravensbrück and Josef Mengele's unconscionable experiments on twin children and other victims at Auschwitz. *See* Peter Tyson, *Holocaust on Trial: The Experiments*, PBS NOVA ONLINE (Oct. 2000).

These revelations helped cast a long shadow over the eugenics movement and nonconsensual medical experimentation in the United States. The movement was a product of lingering social Darwinism, which held that the end of survival of the fittest justified an assortment of dubious means. Yet it is in the means that rights are often most assiduously safeguarded, an idea which escaped many prominent figures in the early twentieth century who gravitated toward the errant belief that the end of "improvement" excused sterilizing assertedly disabled, mentally ill, and marginalized individuals without their consent. *See, e.g.*, *Buck v. Bell*, 274 U.S. 200, 205–08 (1927) (Holmes, J.) (upholding a Virginia law that allowed for the nonconsensual sterilization of "feeble-minded" adults and remarking that "three generations of imbeciles are enough").

It is certainly true that America's eugenics movement was in no sense akin to the unique atrocities perpetrated by the Nazi regime. It is further true that medical science requires experimentation to advance, and that experimental treatments and vaccinations, when undertaken with the full knowledge and consent of their subjects, have brought incalculable benefits to millions across the globe. But the methods of experimentation are

17

all important, and the moral wrongs of regarding "undesirables" as "expendables" sit on our shoulders still.

Our nation's confrontation with the horrors of the Holocaust should have awakened the government to the immense dangers of nonconsensual medical experimentation conducted in the name of societal progress. Yet the record in this case reveals that, almost as soon as victory in Europe was achieved, the U.S. Public Health Service directed, funded, staffed, and executed nonconsensual medical experiments in Guatemala. These experiments involved, among other horrors, intentionally injecting and exposing over one thousand nonconsenting children and adults to gonorrhea, syphilis, and other venereal diseases.

The 1947 Doctors' Trial at Nuremburg occurred in parallel with the Guatemala experiments, further sounding the alarm on the impropriety of intentional and nonconsensual infection of human subjects. *See United States v. Stanley*, 483 U.S. 669, 687 (1987) (Brennan, J., concurring in part and dissenting in part) ("The medical trials at Nuremberg in 1947 deeply impressed upon the world that experimentation with unknowing human subjects is morally and legally unacceptable."). But the nonconsensual experimentation continued. Indeed, the Guatemala experiments constitute but one project in a series of unethical human experimentation by the U.S. government in the mid-twentieth century. *See, e.g.*, Ctr. for Disease Control, *The U.S. Public Health Service Untreated Syphilis Study at Tuskegee* (Jan. 9, 2023); Presidential Commission for the Study of Bioethical Issues, *Ethically Impossible: STD Research in Guatemala from 1946 to 1948*, 13–24 (Sept. 2011) (discussing how the Guatemala experiments were presaged by the Terre

Haute, Indiana experiments, which involved the intentional infection of federal prisoners with gonorrhea); S. REP. NO. 94-755, at 385–423 (1976) (detailing nonconsensual drug testing by the CIA and military intelligence on unwitting human subjects in the United States); Alf S. Alving et al., *Procedures Used at Stateville Penitentiary for the Testing of Potential Antimalarial Agents*, 27(3) J. CLINICAL INVESTIGATION 2, 2–5 (May 1, 1948). Occurring both inside and outside our borders, these experiments primarily targeted marginalized people who had limited ability to wield political power in their own defense. *See* Mike Stobbe, *Ugly past of U.S. human experiments uncovered*, NBC NEWS (Feb. 27, 2011) (discussing over 40 unethical medical studies conducted by U.S. government doctors, primarily during the 1940s to 1960s, and observing that "[m]any prominent researchers felt it was legitimate to experiment on people who did not have full rights in society").

These incongruous thoughts of American exposure to the world of the full depravity of the Holocaust and American participation in the experimentation in Guatemala and elsewhere reveal the most and least admirable features of our wonderful country. There is a temptation in cases involving grievous harms such as these to cast the net of liability wide so as to maximally deter perpetrators and compensate victims. But the record here simply cannot support an extension of liability to the Rockefeller Foundation. While the Foundation did employ the Guatemala experiments' primary investigator, Frederick Soper, it exercised neither control nor direction over his involvement in the experiments while he was detailed to lead the intergovernmental Pan American Sanitary Bureau. And the plaintiffs presented no evidence showing that the Foundation was consulted on the

19

Guatemala experiments or apprised of their unethical methods. Alas, it was our own government, not the Rockefeller Foundation, that was the driving force behind these monstrous wrongs.

Therefore, as the lead opinion has carefully set forth, the relationship between Soper and the Rockefeller Foundation is too attenuated to regard him as its agent, rather than as an agent of the Pan American Sanitary Bureau, with respect to the Guatemala experiments. I thus concur in that opinion with some sadness, but with a conviction that the rule of law is not advanced as an instrument of justice by affixing liability where it does not belong.